The Trustees of the Freeholders and Commonalty of the·
Town of Brookhaven et al., Respondents, *v.* Wilson R.
Smith et al., Appellants.

1. Riparian Rights — Common-law Rule as to Right of Access
Inapplicable — Right of ·Access Includes Right to Construct Pier
Beyond High-water Mark Without Consent of Owner of Land
Under Water.   A riparian owner whose land is bounded by navigable
waters has the right of access thereto from the front of his lot, and such
right includes the construction of a pier on the land under water, beyond
high-water mark, for his own use or for the use of the public, subject to
such general rules and regulations as Congress or the state legislature may
prescribe for the protection of the rights of the public, although under
the common law of England such structure is regarded as a purpresture
or an unlawful encroachment upon the rights of the sovereign, and sub·
ject to removal at his pleasure.   The fact that in the absence of statutory
enactment the courts of this state are ordinarily bound by the rules of
the common law does not compel them to incorporate into our system of
jurisprudence principles which are inapplicable to our circumstances,
and which are inconsistent with what a just consideration of those cir-
cumstances demand.   Where no vested rights are, actually concerned, the
application of common-law rules depends upon the extent to which they
are reasonable and in accord with public policy and sentiment; and in a
state like this, with its numerous large navigable bodies of water, in
bays, rivers and inland lakes, and where so many riparian owners have
made their easement or right of access practical and available by the con-
struction of docks, piers or wharves, and have done so without interfer-
ence by the state when superior public rights have not been obstructed,
such a rule would be without justification and will not, therefore, be
established by the courts.

2. Same — Great South Bay — Town of Brookhaven.   An owner
of upland adjoining Great South Bay has the right of access to the waters
thereof from the front of his lot, and such right includes the construction
of a pier on the land under water beyond high-water mark, for his own
use or the use of the public, without the consent of the town of Brook-
haven, which acquired the title in fee to such land under royal grant in
1666, 1686 and 1693, although at that time under the common law of
England riparian owners had no such right, and such structure, in the
absence of a license therefor, was a purpresture and subject to removal at
pleasure.

*Town of Brookhaven* v. *Smith,* 98 App. Div. 212, reversed.

(Argued November 23, 1906; decided March 12, 1907.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered December 5, 1904, affirming a judgment in favor of plaintiffs entered upon a decision of the court at a Trial Term without a jury.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Willard N. Baylis* and *Frederick R. Coudert* for appellants. The owner of upland bordering upon navigable waters has riparian rights, including the right to make, maintain and use a suitable wharf or pier for a means of access to the navigable part of such waters. (*T. I. S. Co.* v. *Visger*, 179 N. Y. 206; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 76; *People* v. *Mould*, 37 App. Div. 35; *Sage* v. *Mayor, etc.*, 154 N. Y. 70; *Matter of City of New York*, 168 N. Y. 136; *People* v. *P. C. Co.*, 32 Misc. Rep. 478; *City of Brooklyn* v. *Mackay*, 13 App. Div. 105; *Town of North Hempstead* v. *Gregory*, 53 App. Div. 350; 100 N. Y. S. R. 28; *Shively* v. *Bowlby*, 152 U. S. 1.) The common law of England as it existed at the time grants were made to the predecessors in title of the parties to this action does not fix the rights of the parties hereto. Such law has been modified in the several states and colonies, including New York. (*People* v. *Mould*, 37 App. Div. 35; *Kane* v. *N. Y. E. R. Co.*, 125 N. Y. 164; *Bell* v. *Gough*, 23 N. J. L. 629; *P. S. E. Co.* v. *P. S. S. Co.*, 12 R. I. 348; *People* v. *P. C. Co.*, 32 Misc. Rep. 479; *Sumner* v. *City of Gloversville*, 35 Misc. Rep. 526; *People ex rel. N. F. P. Co.* v. *Smith*, 70 App. Div. 543.) The present rights of the town of Brookhaven as to this land under water are identical with the rights the state would have possessed had no patents been granted. The state succeeded the crown in ownership and the present ownership is limited by the ancient common law of England as modified by the evolution of the law of this state during the past two centuries. (*Town of North Hempstead* v. *Gregory*, 100 N. Y. S. R. 28.)

*Timothy M. Griffing* and *W. Kintzing Post* for respondents. Ancient grants must be construed according to the law as it stood at the time they were made. (*People ex rel. Howell* v. *Jessup*, 160 N. Y. 249.) Under the common law, at the date of these patents, a riparian owner upon navigable water had no right to build any structure whatever for any purpose, on the adjoining land under water without license of the king, or other owner of such land, and this irrespective of any question as to the obstruction of navigation. (*Johnson* v. *Barrett*, Aleyn, 10; *Atty.-Gen.* v. *Philpot*, 2 Anst. 607; Hale de Portibus Maris, Hargr. L. Tr. 85; *Atty.-Gen.* v. *Richards*, 2 Anst. 603; *Parmenter* v. *Gibbs*, 10 Price, 412; *Shively* v. *Bowlby*, 152 U. S. 1; *People* v. *Vanderbilt*, 26 N. Y. 287; *Cobb* v. *L. P. Comrs.*, 202 Ill. 427.) The property, vested in the town by its patents, cannot be divested or affected, without compensation, by any modification of the law since those rights became vested. (*Cobb* v. *L. P. Comrs.*, 202 Ill. 427; *Trustees, etc.,* v. *Strong*, 60 N. Y. 56; *Fletcher* v. *Peck*, 6 Cranch, 87.) Even as to the submerged lands of the state the right claimed has never been established in New York. (*People* v. *Vanderbilt* 26 N. Y. 287; *Hedge* v. *W. S. R. R. Co.*, 150 N. Y. 150; *Delancey* v. *Hawkins*, 23 App. Div. 8; *Delancy* v. *Welbrock*, 113 Fed. Rep. 105; *T. I. S. Co.* v. *Visger*, 179 N. Y. 206; *Town of North Hempstead* v. *Gregory*, 53 App. Div. 350; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75; *City of Brooklyn* v. *Mackay*, 13 App. Div. 105; *Sage* v. *Mayor, etc.*, 154 N. Y. 78; *Shively* v. *Bowlby*, 152 U. S. 1.)

GRAY, J. This action is in trespass, for building a pier upon certain lands under water, in the Great South bay; of which the plaintiff, the town of Brookhaven, is seized in fee, under crown grants made by royal governors in the years 1666, 1686 and 1693. The appellant Smith is the owner of a piece of upland, bounded on high water mark, by title derived under a crown grant made to William Nicoll in 1697. From this upland a pier, built upon piles, extended for about 150

feet into and over the waters of the bay; which was owned and used by Smith and the other defendants for their greater convenience and facility in entering and in leaving their pleasure boats.  Post, who is joined with the town as a party plaintiff, is its lessee.  I understand that the plaintiffs conceded that the dock, or pier, was suitable enough for the purpose and, regarded, merely, as a structure, unobjectionable, and that their contention is that, without their consent, the defendants could not erect and maintain it.  The defendants claim that, in erecting the pier, they have but lawfully exercised such rights as appertained to their ownership of the upland and as were necessary, in order to gain access to navigable waters.  The question has been considered and decided below in the light of the rule of the common law of England; as the same was at the time of the grants and as it construed the rights of a riparian owner.  It was held that these grants, having been confirmed by the constitution of this state, constituted contracts, the obligations of which the state cannot impair, and that, therefore, they are to be protected to the extent that they would have been, had "the Sovereign of Great Britain continued the owner of the soil."  In this view the riparian owner is accorded no right, in the absence of a license therefor, to build anything below high water mark and "has no higher rights than those of the General Public."  It is contended upon the authorities, and with reason, that so absolute was the character of the crown proprietorship, if the owner of lands in England, upon the tide water of the sea, or of navigable rivers, constructed a wharf, or a dock, beyond high water mark, his structure, if obstructing the public right of navigation, or the *jus publicum*, could be abated as a nuisance; or if a mere intrusion upon the *jus privatum* of the sovereign, as a purpresture, it was, equally, subject to removal at the pleasure of the crown.  (See Gould on Waters, sec. 167; Hale's de Portibus Maris, 85; *Atty. Gen'l* v. *Richards*, 2 Anstr. 603; *Shively* v. *Bowlby*, 152 U. S. 1.)  It is insisted that this rigid common-law doctrine, upon the subject of a riparian owner's rights, should control

our present decision ; notwithstanding that this court has, in several instances, expressed, and quite deliberately, a rule of interpretation, which gives a practical value, or utility, to the riparian owner's conceded right of access to the navigable part of the body of water in front of his upland. I cannot agree that, in construing these grants of lands under the waters of the bay, we are bound to hold with the doctrine of the common law of England, as to the exclusive nature of the grantee's possession and as to his right to restrict the enjoyment of the riparian owner's right of access. The evidence of the common law, so far as it has not been declared in English statutes, we find in decisions of English courts rendered in existing controversies and those decisions will be given their due effect here, when the law has not been changed by our statutes ; unless new conditions, or a different public policy, demand that the rule contended for be modified by our courts in its application. Different political and geographical conditions may justify modifications and whether common-law rules will be followed strictly by our courts will, necessarily, where no vested rights are actually concerned, depend upon the extent to which they are reasonable and in accord with our public policy and sentiment. In not applying, in all its strictness, the common-law doctrine, as declared by the English courts, this court has only interpreted the rule in a juster and more equitable sense and has affected no vested rights. That the town of Brookhaven, under its grants, acquired the title to the particular lands under water of the bay was settled by the decision in its case against *Strong* (60 N. Y. 56) ; but it took and held the thing granted in its corporate political capacity, and as the representative of the crown, or of the colonial government, to be administered for the public good. (*De Lancey* v. *Piepgras*, 138 N. Y. 26.) Upon the organization of the state government, it continued to hold the soil of the bay in that capacity, and, representatively, for the benefit of the members of the community. Whatever its rights acquired by the grant, they were and are, nevertheless, subject to the public

rights of navigation and to rights of access of riparian owners. · These rights have ever existed and, with respect to the latter, their nature and extent, when brought into question in this state, were not necessarily to be measured by English standards. The proprietary rights of the town were, and they must continue to be, subject to what, under the circumstances, is decided to be a reasonable exercise by the riparian owner of his right of access to the navigable waters of the bay. The argument that the measure of .the right of the riparian owner to the use of the foreshore, or land below high-water mark, for purposes of access to the bay, must be ascertained by reference to what was the rule at common law, at the time of the grants, in my opinion, is unsound. The adoption by the people of this state of such parts of the common law, as were in force on the 20th day of April, 1777, does not compel us to incorporate into our system of jurisprudence principles, which are inapplicable to our circumstances and which are inconsistent with our notions of what a just consideration of those circumstances demands. The common law of England, upon the subject of the rights of riparian owners, has but an imperfect application to the situation in a state like this, with its numerous large navigable bodies of waters, in bays, rivers and inland lakes. (See *Brown* v. *Scofield*, 8 Barb. 239; *People ex rel. Loomis* v. *Canal Appraisers*, 33 N. Y. 461.) To borrow the language of Judge BRONSON, in his opinion in *Starr* v. *Child*, (20 Wend. 149), " no doctrine is better settled than that such portions of the law of England, as are not adapted to our condition, form no part of the law of this state." Such as were inconsistent with the spirit of our institutions, or had special reference to the physical conditions of a country widely differing from our own, never became a part of our law, upon the organization of this state. (*Lowber* v. *Wells*, 13 How. Pr. 456; *People ex rel. Loomis* v. *Canal Appraisers, supra.*) · We have but to consider the position of Great Britain, as an island, with short rivers, navigable only as far as the tide flows and ebbs, and a reason for the rigidity of the rule early asserted as to the extent

of the rights attaching to riparian ownership may appear, in
the apprehension of the "straitening of the port by building
too far into the water." (From Hale's de Portibus Maris.)
Our position is different, physically and governmentally.

The *jus privatum* of the crown, by which the English
king was deemed to own the soil of the sea and of navigable
rivers, in his own right, rather than as a sovereign holding it
in trust for his people, however applicable to the conditions
in Great Britain, were totally inapplicable to the situation of
the colonists of this country.    In Gould on Waters, the
author remarks, as to this, that "there is no evidence that the
*jus privatum*  *  *  *  was ever asserted in the colony as
the right of the Crown, or that it has, until recently, been
claimed by the States; but there is, on the contrary, in my
opinion, the strongest evidence that this right has been aban-
doned to the proprietors of the land from the first settlement
of the province and exercised by them to the present day, so
as to have become a common right and thus the common law."
(3d ed. sec. 32).

I may observe, in passing, that in England the common-
law rule, which left the riparian owner without any remedy,
when his right of access was destroyed by public works, has
been modified, within recent years.    (See *Buccleuch* v.
*Metrop. B'd of Works*, L. R. [5 Eng. & Ir. App.] 418.)

It is a matter of general observation, of which judicial
notice may wisely be taken, that riparian owners everywhere
upon the numerous navigable bodies of waters within the ter-
ritorial limits of this state have made their easement, or right
of access, practical and available by the construction of docks,
piers, or wharfs, and have done so without interference
by the state, where superior public rights have not been
obstructed.    These interests must be very large and if we
shall hold with the English common-law doctrine, that they
are purprestures, or unlawful encroachments upon the pro-
prietary rights of the state, as would follow, if we affirm this
judgment, and that they are removable at pleasure, it would
result in causing a very grave loss.    Such a decision would be

to ignore what has been believed to be a common right, within numerous adjudications of our courts.

In the early case in this court of *Gould* v. *Hudson River R. R. Co.,* (6 N. Y. 522), it was held, upon the authority of *Lansing* v. *Smith,* (8 Cow. 146), that a riparian owner on the Hudson river had no private right, or property, in the waters, or in the shore, between high and low-water mark. In that case the plaintiff sought to recover compensation from the defendant; which, pursuant to a grant from the legislature, had constructed its railroad along the shore between high and low-water mark and, thereby, had cut off his communication with the river. The principle of that decision, as bearing upon the authority of the legislature to deprive abutting owners upon streets of their easements, came under consideration in the case of *Kane* v. *N. Y. Elev. R. R. Co.,* (125 N. Y. at p. 184), and it was observed, with respect to the case, "that it has been frequently criticised and cannot be regarded as a decisive authority upon the point adjudged therein." Judge Andrews points out that in *Lansing* v. *Smith,* upon which the *Gould* case was decided, the particular question was reserved by the chancellor. In *Rumsey* v. *N. Y. & N.E.R. R. Co.,* (133 N. Y. 79), the plaintiffs sought to recover damages to their uplands, sustained through the act of the defendant in cutting off their access to the river by the construction of its roadbed across the water front. The decision was predicated upon the nature and extent of the plaintiffs' rights as "ordinary riparian owners on the banks of navigable rivers" and held, with reference to the *Gould* case, which had been cited by the defendant as a precedent, as in the *Kane Case,* (*supra*), that it was not to be followed. The language of the opinion was that it had "been frequently criticised and questioned and, it is believed, has never been fully acquiesced in by the courts, or the profession, as a decisive authority, or a correct exposition of the law respecting the rights of riparian owners." The rule, as it had been enunciated by the Supreme Court of the United States in the case of *Yates* v. *Milwaukee,* (10 Wallace 497), was adopted by this court in *Rumsey's* case as

6

correctly expressing the right of a riparian owner; whether his title " extends beyond the dry land or not, he is certainly entitled to all the rights of a riparian proprietor, whose land is bounded by a navigable stream, and among these rights are access to the navigable part of the river from the front of his lot, the right to make a landing wharf, or pier, for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public." Later, this doctrine, so explicitly asserted in the *Rumsey Case*, (*supra*), was emphatically reasserted in the case of *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, (144 N. Y. 75, 87). There the question concerned the rights of the owners of lands upon the Hudson river as against the defendant, whose railroad, constructed over the foreshore, cut off convenient access to the river, and it was held that " what these rights are has been decided in the *Rumsey Case*, (133 N. Y. 79). * * * They embrace the right of access to the channel, or navigable part of the river, for navigation, fishing and such other uses as commonly belong to riparian ownership, the right to make a landing wharf or pier for his own use, or for that of the public, with the right of passage to and from the same with reasonable safety and convenience." Quite recently, again, in the case of *Thousand Islands Steamboat Co.* v. *Visger*, (179 N. Y. 206), the rule stated in the *Rumsey Case*, (*supra*), and restated in the *Saunders Case*, (*supra*), was reasserted with respect to the rights of riparian owners, in the following language : " As riparian owners, Cornwall and Crossmon, originally, in building a dock out into the river, but exercised the right, at all times, conceded to such ownership. The proprietors of lands upon navigable waters are entitled to the right of access to the navigable part of the river and to the right to make a landing wharf, or pier, for their own use, or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose," (citing 3 Kent's Com. 451 and the *Yates* and *Rumsey* cases).

It is urged, however, with respect to these cases that the

particular question in this case was not presented in either, namely: the right to construct a pier into the river, and, therefore, that what was said in the opinions should not be conclusive upon us in our present discussion. While it may be true that what was said, as to the measure, or substance, of the riparian owner's right of access from his upland to the navigable body of water in front of it, was not essential to the decision of the precise issue, it was, nevertheless, the deliberate and careful expression of an opinion as to that right and one not altogether impertinent to the decision of the particular case. As establishing the rule of law in this state upon the extent of a riparian owner's right, the decision in the *Rumsey* case has been followed, and acted upon, by the Appellate Division of the Supreme Court, in at least three of the judicial departments. (*City of Brooklyn* v. *Mackay*, 13 App. Div. 105; *Jenks* v. *Miller*, 14 ib. 474; *People ex rel. Cornwall* v. *Woodruff*, 30 ib. 43; *People* v. *Mould*, 37 ib. 35; *Town of North Hempstead* v. *Gregory*, 53 ib. 350; *City of Buffalo* v. *D., L. & W. R. R. Co.*, 68 ib. 488.) It was recognized by the Supreme Court of the United States as authoritative in this state, as late as in *Scranton* v. *Wheeler*, (179 U. S. 141). In each of the cases in the Appellate Division, the question of the substance of the right pertaining to riparian ownership was discussed with more or less elaborateness and the opinion in the *Rumsey* case was regarded as stating the law of the state upon the subject to be that the right of access comprehends the erection of a pier, or wharf. In *City of Brooklyn* v. *Mackay*, (*supra*), a case which concerned the right to construct a pier, it was said by the present chief judge of this court that "the foundation of the argument by the appellants is the assumption that a pier cannot be constructed without a grant from the state of the land under water upon which it rests. This probably was the law in this State under *Gould* v. *H. R. R. R. Co.* (*supra*); but, since the decision in the case of *Rumsey* v. *N. Y. & N. E. R. R. Co.*, (*supra*), it no longer obtains." In *Jenks* v. *Miller*, (*supra*), Judge CULLEN, again, referring to the fact that under the

English law the right of access of a riparian owner did not include the right to erect a pier, or other structure in the water, without the consent of the crown, said: "In this country it has generally been held that the upland owner has the additional right of constructing a proper pier, or landing for the use of himself and the public, subject to the general regulations prescribed by the State or the United States, (*Yates* v. *Milwaukee*, 10 Wall. 497), and, since the decision in *Rumsey* v. *N. Y. & N. E. R. R. Co.*, (*supra*), that is the rule in this State." In *People* v. *Mould*, (*supra*), it was sought to remove a wharf in the Hudson river, which the defendant had constructed, upon the ground that though neither a nuisance, nor an obstruction to navigation, it was a purpresture. The opinion of Judge PUTNAM reviews this question most elaborately and reaches the conclusion that the defendant had but exercised his right of access to the navigable portion of the river and "had only done what was necessary to be done to obtain the benefit of his easement — what the authorities determine he had a legal right to do — without creating a nuisance," when he built his wharf in the shoal water near the shore, without obtaining a grant from the state.

The case of *People* v. *Vanderbilt*, (26 N. Y. 287 and 28 ib. 396), to which reference is made, is not in point; for there the structure erected by the defendant was a crib, with the superstructure of a pier, erected beyond the pier line of the city of New York, as established by law, and it was held to be a public nuisance. The case of *Hedges* v. *West Shore R. R. Co.*, (150 N. Y. 150), was altogether different in its facts. The plaintiff in that case had claimed the right to interfere with the bed of the Hudson river, by digging a canal outside of the limits of his grant and thus changed the natural situation. That portion of the opinion, which is relied upon as limiting the riparian owner's easement, or right of access, must be read in connection with what the plaintiff was undertaking in the maintenance of an artificially deep channel in the bed of the stream from his business plant out into the river. The *Rumsey* and *Saunders Cases*, (*supra*), are

cited in the opinion, (which was delivered by the same judge, who spoke for the court in those cases), as establishing the nature of the rights of a riparian owner. (p. 156.) The cases of *Sage* v. *Mayor, etc., of N. Y.*, (154 N. Y. 61), and of *Matter of City of New York*, (168 ib. 134), did not contain the question now before us; but I find no difficulty in harmonizing what was said in each of the two cases, with respect to the rights of owners of land bounded upon a navigable river, with the rule as stated in the *Rumsey* and later cases, to which I have referred. It was said by Judge VANN in the *Sage* case and, in substance, repeated by Judge WERNER in the other case, that such owners were entitled " to certain valuable privileges or easements, including the right of access to the navigable part of the river in front, for the purpose of loading and unloading boats, drawing nets and the like," and the *Rumsey* and *Saunders* cases were cited. It would seem quite just and quite logical to read the language as intending that whatever might be held to be necessary to the practical enjoyment of the right of access for such purposes would, of course, be comprehended.

In *Shively* v. *Bowlby*, (152 U. S. 1), to which our attention is, especially, drawn, the question concerned the title to lands below high-water mark upon the Columbia river in the state of Oregon; which had been acquired by the plaintiffs in error, while Oregon was yet a territory, from the United States and upon which the defendants in error had built a wharf, under deeds to them from the state of the tide lands. The opinion reviews, at great length, the authorities and reaches the conclusion that the title, which, by the common law of England, was in the king to the soil of the sea, or of its arms, below high-water mark, had vested in the several states of the Union, subject to the rights surrendered by the Constitution to the United States. As by the common law, no one could erect a building, or wharf, upon the land below high-water mark, without a license, it followed, as the common-law rule of England upon the subject had become the law of the colonies and states of this country, except so far as

modified by laws, or usages, and had been declared by the Supreme Court of Oregon to govern the rights in that state of upland proprietors, that the state, under the decision of its court, had the right to sell the lands under water free of any right in the proprietor of the upland. It was held that the law of Oregon, " as enacted by its legislature and declared by its highest court," governed the case. It was pointed out in the opinion that the law of Oregon had followed the law as it had been declared in New York in *Gould* v. *Hudson R. R. R. Co.*, (*supra*), and it was, also, observed that the case had been overruled and a different doctrine declared in later cases in this court; citing *Kane* v. *N. Y. Elev. R. R. Co.* and *Rumsey* v. *N. Y. & N. E. R. R. Co.* (*supra*). The *Shively* case declares the common-law rule upon this subject, as established in Great Britain by the decisions of the courts of that country, and with great clearness ; but it is not, of course, obligatory upon this court to adopt such a rule in the decision of this case. The Federal Supreme Court, in its decision, explicitly, held itself bound by the law of Oregon, as it had been declared by statute and by decisions in the state court. It was, moreover, recognized that the question was one which was for each state to settle; or, as it was said, " each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy."

The interpretation, which, as I have shown, has been given by the courts of this state to the riparian owner's easement, or right of access, is justified in reason, is opposed to no statute and accords better with the circumstances, under which in this country such rights are possessed. This broader view finds some justification in the peculiar nature of our political institutions. In our democratic form of government, the residuary sovereignty not granted to the departments and offices of the government is in the people of the state. The residuary ownership of all property held by the state is in the people of the state and may not the accustomed exercise by property owners of some incidental rights with respect to it, as in the use of the soil of navigable arms of the sea, or rivers,

for the support of piers and docks, become a common right and, as it has been suggested before, the common law of the state? I think so.

The right of access is conceded to be a valuable one and, unless the foreshore has been appropriated by the general government to some superior, and lawful, public use, as for example, by grant to a municipality, or for navigation purposes, it is entitled to the protection of the law. It has recognition in the statutory provisions which confer upon the owner of the upland the primary right to a grant of the land under water. It is not objected that these defendants have erected a nuisance, in itself, or in some obstruction to public navigation. If it were that, the exercise of the right would be unreasonable; for such ownership is qualified and is subordinate to the public right of navigation, and must be subject to such rules as the legislature may impose for the protection of the public rights in the navigable waters. The courts of this state have been careful, in all cases, while sustaining the rights of the riparian owner, to declare them subordinate to the exercise of the power of the legislature, or of the Congress, for the improvement of navigation, or for the regulation of commerce. They must yield to the demands of public commercial necessities. This structure is conceded to be proper enough for the purpose intended by the defendants and it is no appropriation of the land under water; other than as the soil is used to hold the piles. The defendants have, simply, made their right of access practical. It is a general rule that when the use of a thing is granted, everything is granted by which the grantee may enjoy such use. By analogy, we may reason that the riparian owner's right of access to the navigable waters in front of his upland comprehends, necessarily and justly, whatever is needed for the complete and innocent enjoyment of that right.

So I conclude that the question is not what was the common-law doctrine concerning a riparian owner's right in the foreshore, or tideway; but what that right has been construed to mean by the courts of this state. The town of Brookhaven

acquired its title under the royal grants; but it holds it in trust for the members of the community and, if we admit that the plaintiff, Post, as its lessee, took exclusive rights under its lease, they cannot avail to abrogate, or to destroy, a right, which appertained to a riparian ownership, to make available the easement, or right of access, by the construction of a landing pier, or wharf.

For these reasons, I advise that the judgment below be reversed and, as the controversy does not depend upon the facts, that the complaint be dismissed; with costs to the appellants in all the courts.

Hiscock, J. (dissenting). I am unable to concur in the conclusions reached by a majority of my associates.

The facts involved are simple and not in dispute. The plaintiff, the town of Brookhaven, obtained title in fee to the shore in question below high-water mark, under three grants made in behalf of the king, and dated respectively 1666, 1686 and 1693. The respondent Post is its lessee.

Four years after the last grant above mentioned, one of a similar nature was made to William Nicholl under which the appellant Smith has derived title to a small piece of land abutting on the shore at high-tide mark, and the other defendants respectively to other small parcels.

These royal grants are amongst those which were subsequently confirmed by our Constitution (Art. 1, sec. 17), and are entitled to full recognition and credit. They are the foundations upon which must rest the rights of the respective parties.

From the abutting upland above mentioned, appellants have built a dock out over the lands granted to the town into the water for a distance of about 150 feet. We are justified in construing the stipulation of the parties to be that this dock is not objectionable in its form or size if there was a right to build one at all, and this action, therefore, cannot be maintained on the theory that it is such an obstruction to the rights of the public as to be a nuisance *per se.*

There are no special clauses or circumstances found in or connected with the original grants or the subsequent conveyances thereunder which enlarge or restrict the rights of the litigants under such grants as determined by the general rules of law applicable thereto.    It is not urged by the appellants that there was in the grant to the respondents any express reservation of the wharfing privilege which they are claiming. Upon the other hand, the respondents do not claim· that the grant to them of the tideway by the crown while it still owned the upland impliedly cut off any easements ordinarily appurtenant to such upland, but upon this appeal they expressly concede to the owners of the latter the right of access to the water without a pier.    Neither is there any evidence or claim that in New York as in other colonies and states any ordinances or statutes were or have been passed or any recognized custom or usage developed changing the general principles of law upon the subject and giving to the upland owner greater rights than naturally prevailed.    Whatever evidence there is of usage tends to support the respondents' position, because it shows that for many years upland owners have been accustomed to take leases from the town of rights over and beyond the tideway.

Those general principles by which the rights of the parties thus are to be measured, of course, are to be found embodied in the common law as it existed in England at and prior to the dates of the grants and as it had been by the colonists brought to and adopted in this country.    (Const. art. 1, sect. 16.)    For it is well settled that such grants were in the nature of contracts which are to be construed and interpreted in the light of the law as it prevailed when they were made. (*Fletcher* v. *Peck*, 6 Cranch, 87, 137 ; *Danolds* v. *State of N. Y.*, 89 N. Y. 36, 45 ; *People ex rel. Howell* v. *Jessup*, 160 N. Y. 249, 261 ; *Von Hoffman* v. *City of Quincy*, 4 Wall. 535 ; *Pritchard* v. *Norton*, 106 U. S. 124, 132–3 ; *Barnitz* v. *Beverly*, 163 U. S. 118, 125.)

Therefore, this interesting controversy seems to narrow to the question what, under the common law, were the riparian rights of an upland owner abutting upon tide water as against the pro-

prietor of the soil below high-water mark at the time the grants were made through which the parties here derive title, or, to make the issue still more restricted, did that law accord to such upland owner the right to build a wharf over the soil of the other?

This problem must necessarily be determined by reference to those authorities which have interpreted and defined such law, and which are either controlling upon us or proper guides for us in our examination. Their declarations must be accepted as establishing the fact that this ancient law did or did not permit the privilege here claimed by appellants, and their review at considerable length becomes essential even though it may seem tedious.

Before proceeding to a consideration of the authorities, it may be well to call to mind some of the general features and principles which characterize the ownership of the soil under navigable waters, and which may be of assistance in fully appreciating what is said in some of the decisions.

By the common law, both the title and the dominion of the sea and all rivers and arms of the sea where the tide ebbed and flowed and of all the lands below high-water mark within the jurisdiction of the crown of England were in the king, but he held this title and dominion in a two-fold capacity. He had dominion thereof as the representative of the nation and for the public benefit to be derived from the use and enjoyment of navigable waters. This was the *jus publicum* which he could not personally or by grant impair or cut off. The *jus privatum* which the king enjoyed through title to such lands as of waste and unoccupied lands belonged to him as sovereign and proprietor. It was a property right and the title and right which he enjoyed in this capacity he could by virtue of his proprietary interest convey to a private individual, but always subject to the rights and privileges of the people at large comprehended within the definition *jus publicum*. (*Shively* v. *Bowlby*, 152 U. S. 11; *People* v. *N. Y. & S. I. Ferry Co.*, 68 N. Y. 71; *Martin* v. *Waddell*, 16 Peters, 367, 411–13; *People* v. *Vanderbilt*, 26 N. Y. 287, 292–3.)

Upon the settlement of the colonies the rights held by the crown passed to the grantees in the royal charters in trust for the communities to be established, and after the American revolution, charged with a like trust, they were vested in the original states within their respective borders subject to the rights surrendered by the Constitution of the United States. (*Shively* v. *Bowlby*, 152 U. S. 57.) These two classes of rights, public and proprietary, afforded opportunity for two classes of wrongs. An unauthorized obstruction, injuring the *jus publicum* by impeding or in any manner interfering with the common right of the public to navigate and use the waters was and is a nuisance and to be abated as such. A purpresture relates, on the contrary, to the *jus privatum*. It was and is an invasion of the right of property in the soil while held by the king or the people. It might or might not also be a nuisance. (*People* v. *Vanderbilt*, 26 N. Y. 287, 293.) Where, therefore, we find a decision upholding the removal of a dock or similar structure over soil below high-tide water not as a nuisance but as a purpresture, such decision becomes of importance as defining the rights of a proprietary owner as distinguished from the public right of navigation. It could be abated and removed at the suit of the attorney-general in England and by the people in this state, whether a nuisance or not. Being an encroachment upon the soil of the sovereign, like trespass upon the soil of a private individual, it would support an action irrespective of any damage which might accrue. (*People* v. *Vanderbilt*, *supra*.)

Proceeding to the authorities, I shall refer first to some of the English ones which have been called to our attention and which seem to establish that in England the common law forbade the owner of the upland to construct a pier or wharf over the soil below high-water mark.

*Johnson* v. *Barrett*, decided in 1647, is reported in Aleyn's 3 King's Bench Reports, at page 10, as follows: " In an action of trespass for carrying away soil and timber, &c. Upon trial at the bar, the question arose upon a key that was

crected in Yarmouth, and destroyed by the bailiff and bur-
gesses of the town, and Roll said that if it were erected
between high-water mark and low-water mark, then it
belonged to him who had the land adjoining, but Hale earn-
estly affirmed the contrary, viz.: that it belonged to the King
of common right; but it was clearly agreed that if it were
erected beneath the low-water mark, then it belonged to the
King." Here there was no question raised of any impediment
to navigation.

Lord Hale died in 1676. His treatise, De Portibus Maris,
is a leading authority and is found in Hargreave's Law Tracts,
and at page 85, in a list of nuisances, contains the following:
" The straightening of the port by building too far into the
water, where ships or vessels might have formerly ridden;
for it is to be observed that nuisance or not nuisance in such
case is a question of fact. It is not, therefore, every building
below the high-water mark, nor every building below the low-
water mark, is *ipso facto* in law a nuisance. For that would
destroy all the keys that are in all the ports of England.
*   *   *   Indeed, where the soil is the King's the building
below the high-water mark is a purpresture, an encroachment,
and intrusion upon the King's soil, which he may either
demolish or seize or arent at his pleasure; but it is not *ipso
facto* a common nuisance, unless, indeed, it be a damage to
the port and navigation."

In *Attorney-General* v. *Richards* (2 Anstr. [1795] 603),
which was an action to abate a wharf, the court held that it
was immaterial whether or not the wharf was an actual nui-
sance, it was a purpresture and could, therefore, be abated.
(See, also, *Attorney-General* v. *Philpot*, nowhere reported,
but cited in last above case.)

*Parmeter* v. *Gibbs* (10 Price, 412) was decided in the
House of Lords in 1822. The riparian owner had built a
wharf between high and low-water mark and the crown
brought a bill to abate and remove it. Two points were
raised by the defense: *First*, that the defendant had title to
the land under a royal grant. *Second*, that the erections were

no impediment to navigation. The first point having been decided against the defendant, the court declined to consider the second one, holding that upon that ground the judgment ought to be affirmed.

Gould on Waters (Sec. 167) states the common law of England as not securing to the owner of abutting lands the right to extend wharves beyond high-water mark of tide waters.

When we pass to the consideration of decisions in the different courts of the United States, it is, of course, to be borne in mind that the rule of common law as laid down in England has been affected in various states by legislation or usage, and that, therefore, a decision relating to this right in one state would not necessarily be an authority upon the same question arising in a different one. When, however, we find a decision based upon the common law as it existed prior to April 19, 1775, as of which date we incorporated the principles of that law into the law of this state, or an opinion pertinently discussing and defining the common law as it then existed, such decision or discussion becomes a proper authority by which to shape our course in the present case. I think that the clear weight of such authorities is against the right of the upland owner to wharf out over the tideway and adjoining soil. It is not practicable to review all of the judicial literature bearing upon this subject, and I shall refer only to a few of the utterances of courts outside of this state which unquestionably are entitled to much respect.

In *Weber* v. *Harbor Commissioners* (18 Wall. 57) the plaintiff filed a bill against the defendants to compel them to abate and remove certain erections made by them on the water front of San Francisco, which he alleged interfered with a wharf rightfully put there by him. His rights depended upon certain acts of the legislature of the state giving to the city of San Francisco rights in portions of the lands covered by the tide waters of the bay of San Francisco in front of the city, and a subsequent grant by the city to Weber's predecessors of its title to certain lots. The discussion involved a consideration of what plaintiff's rights would have been in

the absence of legislation or usage, and Mr. Justice Field, after referring to the case of *Yates* v. *Milwaukee* (10 Wall. 497) as applying the correct doctrine to the facts there involved, said : " Nor is it necessary to controvert the proposition that in several of the states by general legislation or immemorial usage the proprietor whose land is bounded by the shore of the sea or of an arm of the sea possesses a similar right to erect a wharf or pier in front of his land extending into the waters to the point where they are navigable. In the absence of such legislation or usage, however, the common-law rule would govern the rights of the proprietor, at least in those states where the common law obtains. By that law the title to the shore of the sea and of the arms of the sea and in the soils under tide waters is, in England, in the King, and in this country in the State. Any erection thereon without license is, therefore, deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a purpresture, which he may remove at pleasure, whether it tend to obstruct navigation or otherwise."

The case of *Shively* v. *Bowlby* (152 U. S. [1893] 1) contains a most elaborate and painstaking discussion of the law upon this question, reviewing with much detail the decisions of the different states. That case came up from Oregon and the direct question involved was whether a donation land claim bounded by the Columbia river, acquired under an act of Congress while Oregon was a territory, passed any title or right in lands below high-water mark as against a subsequent grant from the state of Oregon pursuant to its statutes. The case involved a consideration of the common law upon the question here under discussion as it existed in England and was adopted in this country, and the opinion affirmed each of the following propositions :

1. In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or arms of the sea, below ordinary high-water mark, is in the king, except so far as an individual or corporation has acquired rights in it by express grant or by prescription or usage. It is equally

well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high-water mark, unless either the language of the grant or long usage under it clearly indicates that such was the intention.  By the law of England every building and wharf erected without license below high-water mark, where the soil is the king's, is a purpresture, and may, at the suit of the king, either be demolished, or be seized and rented for his benefit, if it is not a nuisance to navigation.

2. The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country, except so far as it has been modified by the charters, constitutions, statutes or usages of the several colonies and states, or by the Constitution and laws of the United States.

3. The new states admitted into the Union since the adoption of the Constitution have the same rights as the original states in the tide waters and in the land below the high-water mark within their respective jurisdictions.

4. The jurisprudence of Oregon is based on the common law.

And, finally, as a general deduction that in a state like Oregon where there was no special legislation or usage, the common-law rule enunciated would govern the rights of the upland proprietor and he would not be entitled to wharf out.

In *Cobb* v. *Commissioners of Lincoln Park* (202 Ill. 427) there were under discussion the rights of an upland owner bordering on Lake Michigan, the question being whether such upland owner possessed an easement permitting him to build wharves over the submerged lands in front of him in order to reach the navigable water.  The court, in a carefully prepared opinion, assumed the rights of a riparian owner upon the lake to be the same as those of such an owner fronting upon the sea.  It decided that the principles of common law which were adopted in that state as they existed prior to March 24, 1606, were still applicable, there being no statute or usage which had modified such law, and then further that "A riparian owner had no right to build any structure on the sub-

merged lands in front of his own lands unless he owned such submerged lands or had a license to do so. The title of the owner of such submerged lands is not burdened with an easement in favor of the owner of the adjoining upland to build wharves out to navigable water. Such being the common law it is the law of this state until it is altered by the legislature.''

In Connecticut the well-recognized right of the upland owner to erect wharves is predicated upon general, immemorial usage rather than upon the common law. (*East Haven* v. *Hemingway,* 7 Conn. 186, 203.)

In reviewing the decisions of our own state, I shall refer first to those which are in harmony with the English and American cases already cited, and then I shall attempt to analyze both the New York cases and some elsewhere wherein something has been said which the appellants regard as sustaining their position.

*People* v. *Vanderbilt* (26 N. Y. 287) was brought to restrain the defendant from proceeding to the erection of a pier extending into the North river and to compel the removal of the part already built as a public nuisance. Upon the trial, the defendant's counsel offered to prove that the proposed pier and crib were not and would not be when completed a nuisance or interference in any manner with the navigation of the river. The trial court rejected this evidence, holding that if the pier were unauthorized by law, it would be *per se* a nuisance. Upon appeal the court discussed the rejection of this evidence, saying: "The right of property in the soil or bed of a navigable river or arm of the sea, and the right to use the waters for the purposes of navigation, are entirely separate and distinct. The first of these rights is by the common law vested *prima facie* in the sovereign power. * * * The second is a right common to the whole people, and it is vested in the public at large. A purpresture is an invasion of the right of property in the soil, while the same remains in the king or the people. A nuisance is an injury to the *jus publicum,* or common right of the public to navigate the waters. * * * If the injury com-

plained of be a purpresture, it may be abated and removed at the suit of the Attorney-General in England, and of course of the people in this state, whether it is a nuisance or not. * * * Being an encroachment upon the soil of a sovereign, like trespass upon the soil of a private individual, it will support an action irrespective of any damage which may accrue. But where the action is to remove a nuisance, which is not a purpresture, a nuisance in fact must in all cases be shown to exist." And it was held that the structure was a purpresture and liable to removal irrespective of whether it was or was not a nuisance.

*Sage* v. *Mayor, etc., of New York* (154 N. Y. 61) involved the question of riparian rights possessed by an owner of land bounded on the Harlem river, which is a navigable stream where the tide ebbs and flows. Judge Vann, manifestly after great research, discusses most thoroughly the origin and extent of these rights, and it is significant that after doing this in defining them he simply enumerates the right of access to the navigable part of the river in front of the riparian lands for the purpose of loading boats, drawing nets and the like, and does not anywhere include as one of the privileges or easements held by the riparian owner, the right to wharf out into the stream.

*Hedges* v. *West Shore R. R. Co.* (150 N. Y. 150) involved a controversy between a riparian owner upon the Hudson river and the defendant, which had built its road upon a structure of open piling below high-water mark in front of his premises under a privilege acquired from the state, leaving, however, to the riparian owner suitable and reasonable means of access to the channel. The extent of the rights of such a riparian owner were necessarily involved and fully discussed, and it is again significant that there is not included amongst them, but rather seems to be excluded from them, the right to wharf out into the stream, which right would almost necessarily have been interfered with by the railroad structure in question. The substance of the opinion upon this subject is fairly expressed by that portion of the head note

7

which states as follows : " The owner of uplands bounded by the waters of a tidal river has a natural easement or right of access to the channel, but this does not include any right arising from the use of land under water or the bed of the river, below high-water mark."

It is also to be noted that the opinion in this case was written by the same judge whose expressions in the *Rumsey* and *Saunders* cases, hereafter to be referred to, are cited by the appellants as authority for their contention in favor of such right to erect a wharf.

*Matter of City of New York* (168 N. Y. 134) is the so-called "Speedway" case, where the city, by constructing a roadway along the Harlem river, had destroyed the riparian rights of the owners of uplands abutting on that river. The case naturally called for a consideration of what those rights were, and Judge Werner, in a most careful and elaborate opinion, defines them (page 143) as follows : " The owner of uplands abutting upon a navigable river where the tide flows and ebbs, takes title only to high-water mark. While he does not own the tideway, or the lands under water beyond the same, he has the easement of passàge and the transportation of merchandise, to and fro, between the navigable water and his land ; to fish and draw nets ; to land boats and to load and unload the same." There is no suggestion of the right to construct a pier or wharf.

The cases which are especially relied upon by the appellants as sustaining their position directly or indirectly rest upon the case of *Yates* v. *Milwaukee* (10 Wall. 497). ·Either that decision or some decision expressly based upon it furnishes the only important authority for the doctrine which they invoke, and I shall, therefore, consider it first. It was said in that case : " But whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream ; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for

the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be. This proposition has been decided by this court in the cases of *Dutton* v. *Strong* (1 Black, 25), and the *Railroad Co.* v. *Schurmeir* (7 Wall. 272)." This case related to rights of a riparian owner upon an inland navigable stream and not upon water where the tide ebbed and flowed, and between which kinds of water a distinction has at times been drawn. Furthermore, the only question involved was whether the common council of the city of Milwaukee could, by merely declaring a pier to be an obstruction to navigation and a nuisance, lay the right for removal, there being no evidence that it was in fact such obstruction or nuisance, and this was the precise issue determined by the learned court. (Page 505.)

Under these circumstances the decision as purporting to define the right of an upland owner, at least upon tide water, to build a pier into the navigable water, has been in effect comprehensively overruled by cases already referred to at length. (*Shively* v. *Bowlby*, 152 U. S. 1, 36, 40; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65.)

And in the *Sage* case (page 78) Judge VANN very pertinently says: "In *Yates* v. *Milwaukee* (10 Wall. 497) much was said that favors the theory of the plaintiff, but all that was decided is that a wharf built by a riparian owner on the bank of a navigable river in the State of Wisconsin under statutory permit cannot be declared a nuisance without a judicial trial."

The case of *Ill. Cent. R. R. Co.* v. *Illinois* (146 U. S. 387), which also is cited as an authority in some of the New York cases hereafter to be referred to, requires very little consideration upon the point here involved. What was held in that case was simply that the railroad company, under express authority of the law, having constructed its tracks along the shore of Lake Michigan in such a manner as in no respect to interfere with any useful freedom of the lake for commerce, could not be regarded as having encroached upon

the domain of the state in such a manner as to require the interposition of the court for the removal of the tracks.

Before passing to the analysis of other New York cases, it is proper to recall that in 1852, in *Gould* v. *Hudson River R. R. Co.* (6 N. Y. 522) in substance it had been held that the owner of lands on the Hudson river had no property in the shore between high and low-water marks, and, therefore, was not entitled to compensation when the same was taken for the construction of a railroad in such a manner as to shut him off from all convenient access to the water.

This doctrine had been doubted and criticised in various decisions before the decision of *Rumsey* v. *N. Y. & N. E. R. R. Co.* (133 N. Y. 79), and the court in that latter case was fairly called upon to decide whether it would or would not follow the *Gould* case, for practically the same question was presented in both. The important question involved was the general one, whether an upland owner had any easements and privileges for the destruction of which by the railroad company he was entitled to recover damages. The details of those rights, if any, were not specially in controversy or under consideration. No question of the right to construct a pier into the river was presented except as it might be incidental to and embraced within the general subject.

The court repudiated the doctrine of the *Gould* case, holding that the upland owner did have rights and easements, and then the judge writing the opinion by way of illustration quoted the remarks of Mr. Justice MILLER, in the case of *Yates* v. *Milwaukee*, already referred to. There was no other statement whatever in the opinion that an upland owner had a right to wharf out into the river, but upon the contrary, in summing up his conclusions, the judge who wrote said : " It must now, we think, be regarded as the law in this state that an owner of land on a public river is entitled to such damages as he may have sustained against a railroad company that constructs its road across his water front and deprives him of access to the navigable part of the stream."

The case of *Saunders* v. *N. Y. C. & H. R. R. R. Co.*

(144 N. Y. 75) involved a consideration of the obligations of a railroad company which had built upon land granted by the state between the upland and the usual place of access by an upland owner to the river, and it was held that such a grant by the commissioners of the land office did not extinguish or impair the easements or riparian rights of such an owner. Again, as in the *Rumsey* case, the question actually involved was the general one of impairment of the rights and privileges possessed by the upland owner. The question was not as to the exact extent of those easements and especially the right to build a wharf into the river was not being considered.

Under those circumstances it is true that the opinion, being written by the same judge who had written in the *Rumsey* case, did state that such rights embraced the right to make a landing wharf or pier for the use of the upland owner or of the public. This statement however, was expressly based upon the proposition that such right had been affirmed in the *Rumsey* case and reaffirmed in the *Illinois Central Railroad* case. There was nothing to suggest the query whether this right to construct a pier was really included in the privileges of the abutting owner, but what was written was but a general definition of a class of rights which, by reference to the authorities cited, was assumed to include the wharfing privilege.

The question in *Thousand Island Steamboat Co.* v. *Visger* (179 N. Y. 206) was whether a riparian owner upon the St. Lawrence river, owning a dock erected upon land granted by the people of the state of New York for the purpose of promoting the commerce of the state and for no other object or purpose, had a right to the exclusive use of said dock, or whether it was open to the use of all who were engaged in promoting the purposes of the grant, namely, the commerce of the state. That was the precise question involved, and there was none about the right of the riparian owners to maintain their dock in the river. It is true that the opinion, speaking of the fact that the owners or their predecessors had originally built the dock before the grant by the state,

did state that, "The proprietors of lands upon navigable waters are entitled to a right of access to a navigable part of the river and to the right to make a landing wharf or pier for their own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public whatever these may be," and in support of this proposition cited the *Yates* and *Rumsey* cases. But no issue was being raised in this case as to the right to erect and maintain the dock. The only one was over its use as between the owners and the general public, and I think that this relationship was all that the judge who wrote had in mind when speaking of the right to build "subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public."

Thus we find that all of the expressions in these cases tending to support appellants' proposition are rather by way of illustration and amplification of what was essentially involved than otherwise, and moreover that directly or indirectly they are based upon the *Yates* case which, upon this point, can no longer be regarded as authoritative.

Some other cases have been called to our attention in the Appellate Division and at Special and Trial Term, where something has been said affirming the right to build a pier. Whatever was said upon this point was based especially upon the *Yates* case or upon one of the New York cases based upon that case, and with the exception possibly of the *Mould* case, what was said was dictum or part of some general statement of the privileges of a riparian owner and with nothing to suggest the specific question whether the wharfing right was really one of those privileges.

In the case of *People* v. *Mould* (37 App. Div. 35) it was held, by a divided court, that the state could not compel a riparian owner on the Hudson river to remove a wharf erected by him without having obtained a grant from the state in the shoal waters in front of his uplands and reaching the navigable part of the stream, on the ground simply that it was a pur-

1907.]    PEABODY v. LONG ACRE SQUARE BLDG. CO.    103

N. Y. Rep.]                 Statement of case.

presture when it was not shown that such wharf was actually a nuisance or an obstruction to navigation.   The opinion upon that appeal extensively reviews the authorities upon this subject, the important ones of which have been analyzed in this opinion, and it does affirm the right of an upland owner to wharf out into the navigable water.   In view of the space already devoted to the consideration of the authorities upon which this decision is based, it does not seem necessary to review it at length.   I can only say that I do not regard its conclusions as sustained by the weight of authority or as furnishing a precedent which should be accepted by this court.

What has been said sufficiently indicates my opinion that the weight of authority sustains the proposition urged by the plaintiffs that under the common law as it prevailed in England and as we adopted and have recognized it in this country, at the time the grants were made to the parties and their predecessors, an upland owner did not have the right to build a wharf over the land below high-water mark into the water, and that in this state the common law has not been changed by statute or usage.

Therefore the judgment should be affirmed, with costs.

CULLEN, Ch. J., O'BRIEN and HAIGHT, JJ., concur with GRAY, J.; VANN and WERNER, JJ., concur with HISCOCK, J.

Judgment reversed, etc.