Foster, J.
This is an appeal from an order of the Appellate Division, Third Department, in a proceeding under article 78 of the Civil Practice Act, which reversed an order of the Albany County Special Term dismissing the petition herein and annulled the determination of the Board of Commissioners of the Land Office of the State of New York (predecessor to Cortlandt Van *11 Rensselaer Schuyler, Commissioner of General Services of the State of New York).*
The petitioners-respondcnts are the Village of Old Field and the Town of Brookhaven in Suffolk County, and Catherine C. Willis, a property owner. The Commissioner of General Services of the State of New York and Flax Pond Improvement & Realty Corp. are the appellants in this court.
The appellant realty corporation (hereinafter called Licensee) is the owner in fee of a 150-acre tract in the Village of Old Field, Town of Brookhaven, which includes 20 acres of beach land with a frontage of 2,800 feet on Long Island Sound, and also Flax Pond, a 100-acre shallow body of water connected with the Sound by an artificial channel cut through by a predecessor in title to the Licensee. In addition, the Licensee owns two jetties extending into the Sound from high water at the edge of the beach line and opposite the channel into Flax Pond, which were constructed pursuant to an easement from the State by the same predecessor in title.
The jetties were constructed pursuant to an easement granted to one Childs, predecessor in title to the Licensee, by the Board of Commissioners of the Land Office on September 10,1942. The area the easement embraced was set forth in metes and bounds and covers 3.2 acres. The easement began in the high-water line of the Sound and ran 57 feet along such high-water mark and out into the Sound a distance of 385 feet. The Licensee’s predecessor in title built the jetties within the easement area and dredged between them to the channel connecting Flax Pond with the Sound. He attempted to dredge the pond itself but in the hurricane of 1945 his dredger was lost and no further dredging was done thereafter. Since 1945, the former channel has been gradually filled up with material, presumably sand and gravel.
The Licensee purchased the Flax Pond property, including the beach front on the Sound and the adjacent upland, sometime prior to April 20, 1960. On that date it applied in writing to *12 the Board of Commissioners of the Land Office for a license, pursuant to subdivision 5 of section 3 of the Public Lands Law, to fake sand, gravel and other materials on deposit upon land under the water of Long Island Sound lying within the entrance channel to Flax Pond. The application stated that the removal of the materials from the requested license area was necessary for the improvement of navigation to and from Flax Pond. The map attached to the application clearly shows that the license area requested ran from the high-water mark of the Sound and out under the waters thereof. Attached to the application for a license was a permit for the proposed dredging duly issued by the United States Army Corps of Engineers. This was required because the waters of Long Island Sound are navigable waters within the jurisdiction of the United States (U. S. Code, tit. 33, § 403).
After a hearing, authorized but not mandated, the Board of Commissioners of the Land Office granted a license to dredge a channel between the jetties at the inlet to Flax Pond and for 600 feet beyond the extremities of the jetties into the waters of the Sound, to a depth of 12 feet below mean low water. There were conditions attached which are immaterial for the purposes of this opinion. The license was issued pursuant to the provisions of subdivision 5 of section 3 of the Public Lands Law, and it was the citation of this part of the statute which caused the ensuing legal difficulties.
At this point, and for the sake of continuity, we quote this part of the statute. “ 5. The commissioner of general services may license and regulate the taking of sand, gravel or other materials found in deposit in or upon lands of the state under water, but not including such lands in or bordering upon Erie county, and not including such lands under the waters of Lake Erie bordering upon Chautauqua county, and may prescribe the terms and conditions under which the same may be taken, including the amount of license fees. This provision, however, shall not apply to such lands in, on, or bordering upon Long Island, except that when in the opinion of the United States government, as evidenced by the recommendation of the corps of engineers of the United States army and authorized by the secretary of the army, removal of such sand, gravel or other materials becomes necessary for the improvement of navigation, the com *13 missioner may license and regulate the removal of such materials upon such terms and conditions as he may deem advisable, including the amount of the license fees therefor. License fees shall not be discriminatory, but this provision shall not require the fixing of a uniform license fee throughout the state. After the adoption of regulations by the commissioner, it shall be unlawful to take or remove from lands of the state under water any s'and, gravel or other material, without license. The commissioner, may, in his discretion and upon such terms and conditions, including consideration, as to him shall seem just and proper, authorize the taking of soil from state land under water where such soil is to be taken by an upland owner bordering on state land under water for the improvement or the protection of his upland from the action of the water, or for the restoration, in whole or in part, of his upland where there has been sudden washing away and loss of soil thereof by violent storm and consequent avulsion, but where the title to his land has not been lost, the boundary line remaining the same; the preceding provisions of this subdivision, respecting the business of taking sand, gravel or other material from state land under water, are not affected by the provisions hereof respecting the taking of soil by the upland owner. ’ ’
After the license had been granted the petitioners-respondents brought the proceeding before us in the nature of certiorari, under article 78 of the Civil Practice Act, to review the action of the Commissioners of the Land Office in granting the license. The appellants resisted the proceeding, and moved to dismiss the petition, claiming that the action of the Commissioners was a permissible exercise of discretion; that certiorari did not lie in any event, and that petitioners-respondents were not parties aggrieved. The petition of respondents had alleged that the Board of Commissioners had exceeded its powers under subdivision 5 of section 3 of the Public Lands Law, and its action was illegal and void.
The Special Term rejected the jurisdictional objections to the petition, but held on the merits that the board had authority to issue the license for the improvement of the Licensee’s upland without any “ action of the water ” restriction; and hence dismissed the petition. The Appellate Division reversed. By reason of the contextual arrangement of the statute, the pre *14 existing regulatory law, the storms of the year preceding the enactment of the statute, and certain bill jacket material, the Appellate Division construed the statute to authorize the issuance of a license only to permit an upland proprietor to protect or improve his property when necessary to prevent shore-line erosion arising from the action of water. Accordingly, it held that in issuing the dredging license without • any showing of necessity to remedy or prevent shore-line erosion the board exceeded its statutory authority. The Appellate Division also rejected the jurisdictional objections to the petition.
We are thus confronted by this peculiar and anomalous situation: although the Licensee has an easement to maintain jetties out into the waters of the Sound, and its predecessor in title once dredged the channel between them, it cannot now redredge the same channel if the Appellate Division’s decision is correct. The respondents, however, do not agree with the rationale of the Appellate Division’s decision, at least not entirely. They argue in their brief that the license was applied for and granted solely for a navigation purpose without any certification by the Federal Government that it was necessary for the improvement of navigation, a statutory condition precedent, and hence the board was without authority to grant the license.
Indubitably, the purpose of dredging between the jetties was to open a channel of navigation up to the entrance of Flax Pond. The petition for a license so states, and the physical setup indicates clearly, that the Licensee could have had no other purpose. We are constrained to the belief that the permit issued by the Army Corps of Engineers was a sufficient certification for navigation purposes. It is true that the permit does not use the words ‘ ‘ for the improvement of navigation ’ ’ but we think this is necessarily implied. The Army Corps of Engineers was well acquainted with the situation, for in 1942 it issued a permit to Childs, the Licensee’s predecessor in title, for the construction of the jetties. Then when the Licensee applied on .January 28, 1960 for a permit to dredge the area between the jetties, and for some 600 feet beyond, it attached a map to its application which indicated the scope of its proposed operations, and was entitled “Proposed Redredging of the Entrance Channel at Flax Pond ’ ’. This map shows clearly that the *15 purpose of the proposed redredging was to open a channel for navigation to the entrance to Flax Pond. Indeed, it is difficult to conceive of any other purpose under the circumstances. Thus, with these facts before it, when the U. S. Corps of Engineers, by the authority of the Secretary of the Army, issued its permit, it must have known and approved the project as necessary for the improvement of navigation. The form its consent or recommendation took is not controlling but rather the facts underlying such consent or recommendation, and the inevitable implication arising therefrom. This view, which was not evinced by either the Special Term or the Appellate Division, leads us to the conclusion that the requirements of subdivision 5 of section 3 of the Public Lands Law were reasonably satisfied as to this matter and hence the board had authority to issue the license.
Of course an argument can be made that under section 75 of the statute a license could be issued for the purpose of beneficial enjoyment to the upland owner, but the board did not issue the license on that basis. An argument can also be made that the Licensee as a riparian owner has a right of access to navigable water (Town of Brookhaven v. Smith, 188 N. Y. 74), but that does not mean that a riparian owner may dredge under navigable waters without the consent of the State and the Federal Governments. We prefer not to rest this opinion to reverse on such tenuous arguments but squarely upon the navigation issue, for essentially it is navigation that is involved.
It should be noted that the proposed dredging is to end at the high water of the Sound and does take in the entrance to Flax Pond. This entrance is the property of the Licensee over which the State has no jurisdiction. We have no doubt that the Licensee intends ultimately to attempt to dredge the entrance to Flax Pond and the pond itself, but the State had no power and did not purport to license any such projects.
We assume for the purposes of this opinion, however, that respondents are aggrieved parties, although this may be subject to some doubt. The respondents attempt to justify their interest on the ground that redredging the channel is preliminary to dredging the entrance to Flax Pond and the pond itself. Granting that this is so, the proceeding herein in no way prejudices any rights the respondents may have in Flax Pond. If and when the Licensee attempts to dredge Flax Pond, the respondents *16 are free to bring any action they are so advised to protect their alleged rights.
The order of the Appellate Division should be reversed and the petition dismissed, with costs.
Chief Judge Desmond and Judges Dye, Fuld, Van Voorhis, Burke and Scileppi concur.
Order of Appellate Division reversed and that of Special Term reinstated, with costs.

 On October 1, 1960, the Board of Commissioners of the Land Office of the State of New York was abolished, and all its functions and powers transferred to the Office of General Services of the State of New York (L. 1960, eh. 462). By chapter 643 of the Laws of 1962, the Public Lands Law was amended generally to change the references therein from the board to the Commissioner of General Services.