## ALASKA GOLD RECOVERY CO. et al. v. NORTHERN MINING & TRADING CO.

Second Division. Nome. January 23, 1926.

No. 2976.

1. Contempt ⬤➤80—Motion to Stay Proceedings Because Plaintiff Is In Contempt of Court in Another Case Between the Same Parties.

The Alaska Gold Recovery Company began a suit to condemn a small tract of land adjoining its property, to enable it to work its mining claims on the shore of Bering Sea. Defendant moved to stay proceedings on the ground that the plaintiff was in contempt of court in another case pending in the same court, wherein the defendant in this case was plaintiff and the plaintiff in this case and others were defendants. *Held* that, whatever penalties might be imposed for the alleged contempt, such penalties could only be imposed after a hearing in proceedings under the statute, with or without a trial by jury, and that the granting of the motion herein is not one of the penalties enumerated or contemplated by the statutes in matters of contempt.

2. Parties ⬤➤76(7)—Pleading—Want of Legal Capacity to Sue.

Demurrer for want of legal capacity of a party to sue has reference to some legal or personal disability of the party, such as infancy, idiocy, or coverture, not to right of action.

3. Parties ⬤➤75(9)—Pleadings—Defect of Parties.

Demurrer upon the ground of defect of parties reaches only the absence of necessary parties and not the absence of proper parties. It does not include a joinder of improper parties, or an excess of parties, or that too many parties are brought in.

4. Eminent Domain ⬤➤178½—Abatement for Transfer of Interest.

That some of the joint plaintiffs in the condemnation proceedings have parted with their title to the other plaintiffs is not a bar to the right of condemnation.

5. Action ⬤➤45(1)—Pleading ⬤➤193(8)—Several Causes of Action Improperly United—Inconsistent Prayer Not Demurrable.

The objection that several causes of action are improperly united cannot be based upon the fact that the prayer of the complaint included, with the prayer for condemnation under eminent domain, also a prayer for injunctive relief. The prayer for improper or inconsistent relief does not render a complaint demurrable.

6. Mines and Minerals ⬤➤9—Mining on Sea Beach at Nome.

Under the provisions of section 129, Comp. Laws Alaska 1913, miners may work the beach gravels of Bering Sea, though there may be no miners' rules on the subject.

⬤➤See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. **Eminent Domain** ⊂⊐33—**Mines and Minerals—Mining on Sea Beach at Nome.**

  The owner of a sea beach claim at Nome, desiring to mine it for placer gold, has the right of eminent domain, and may condemn easement over adjoining uplands to enable him to operate the necessary machinery to work the beach.

8. **Eminent Domain** ⊂⊐33—**Mines and Minerals—Public Use.**

  The plaintiff corporation owned mining claims on the Bering Sea tide lands, and also above the beach line on the upland. It desired to mine its tide land claims with machinery in a larger way, but the defendant owned a strip of worked-out ground between the plaintiff's claims, which it would not dispose of to the plaintiff, except upon an excessive price and the sale of other large tracts, which the plaintiff did not need or wish to buy. The plaintiff brought proceedings under the statutes of eminent domain to condemn a small tract (1.4 acres) of this worked-out ground belonging to defendant for its use in such mining. . On demurrer to the complaint, *held*, the taking of defendant's worked-out ground for that use is to take it for a public use; demurrer overruled.

This action, or proceeding, was brought by plaintiff to condemn, under eminent domain statutes, a small part of a certain placer mining claim belonging to the defendant.

A motion to stay the proceeding as against the plaintiff Alaska Gold Recovery Company, a corporation, was made by the defendant, which motion was made in the nature of a "suggestion" to the court, based upon the alleged fact that said plaintiff corporation was in contempt of court for failing to obey a mandatory injunction theretofore granted, as part of a restraining order issued in another action pending in this court, in which the defendant herein was plaintiff, and in which the alleged contemnor, together with one Haynes, were defendants. The condemnation proceedings were instituted to secure the right which they were prevented in part from exercising by the restraining order, and were instituted on June 30, 1925, and within the time allowed defendants, under the restraining order, to remove their personal property from the premises of the defendant herein. The failure of the alleged contemnor to remove all of said property within the time limited in the restraining order is now urged as a reason for staying the proceedings against it in this action or proceeding.

⊂⊐See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The defendant also demurred to the complaint in the condemnation proceedings. The motion and demurrer were argued at the same time, and will be considered together in the opinion following.

Geo. D. Schofield, of Nome, for plaintiffs.
Ira D. Orton, of Nome, for defendant.

LOMEN, District Judge. Assuming for the purposes of argument that the plaintiff Alaska Gold Recovery Company was technically guilty of contempt of court in not obeying said mandatory injunction, it may well be that, in effect, the condemnation proceedings were intended as a substitute for the removal of the property, and, in effect, an application for a modification of said restraining order.

The circumstances of the present case are in many respects on a par with the case of Baillie v. Larson (C. C.) 138 F. 177. In that case, however, the condemnation proceedings were first commenced, and defendant sought, by a counteraction, to enjoin the plaintiff in the condemnation proceeding. A restraining order was asked for. Judge Beatty withheld, or "delayed," the restraining order, pending the condemnation proceedings, the complaint in which was demurred to by the defendant.

It does not seem to the court that, because the sequence in the order of the proceedings in the case at bar is different from that of the case above cited, the defendant should, by reason of that fact, be given a greater advantage than he would have had, had the order of the proceedings been reversed. Certain it is that the court, in issuing the restraining order herein, did not have in mind an adverse effect upon any condemnation proceedings that might be instituted. There are other reasons why the motion for a stay of the proceedings should not be granted:

(1) The parties to the action are not the same. The stay of proceedings would injuriously affect the innocent, as well as the guilty, plaintiff.

(2) The motion is not made in the action in which the restraining order was issued.

(3) The cases in which proceedings have been stayed because of an alleged contempt of court have been in matters where the contemnor appealed to the discretion of the court, and for a favor, and not where he came into court to enforce an absolute

right.  The cases cited by the defendant in support of its motion —Campbell v. Justices of Superior Ct., 187 Mass. 509, 73 N. E. 659, 69 L. R. A. 311, 2 Ann. Cas. 462; Hovey v. Elliott, 167 U. S. 409, 17 S. Ct. 841, 42 L. Ed. 215—were of such character.

(4) To postpone a trial as to one and not the other plaintiff would be to split the cause of action, and to necessitate more than one trial.

(5) To impose the penalty asked for, without a trial in contempt proceedings, would be contrary to the "law of the land." This was defined by Webster, in the Dartmouth College Case, as "a law which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial."

(6) It does not appear that the plaintiff Alaska Gold Recovery Company was guilty of any contempt of court at the time of the commencement of the condemnation proceedings.  The latter, being instituted to enforce an absolute right, should not be barred or abated by reason of a subsequent contempt in another case, and not necessarily, though committed in the same case.

On the grounds stated we conclude that, whatever penalties might be imposed for the alleged contempt, such penalties could only be imposed after a hearing in proceedings under the statute, with or without a trial by jury, and that the granting of the motion herein is not one of the penalties enumerated or contemplated by the statutes in matters of contempt.

In Hovey v. Elliott, supra, the question was raised as to whether the trial court was not limited to the infliction of the penalties authorized by statute only, but the Supreme Court did not pass upon that question, nor express an opinion thereon, expressly stating that it was unnecessary to do so, deeming it sufficient to pass upon the "more fundamental" question as to "whether a court possessing plenary power to punish for contempt, unlimited by statute, had the right to strike the contemnor's answer in the case, and to enter judgment pro confesso against him."  To the latter question the court rendered an "imperative and negative" answer.  The court, in its opinion, reviewed the English and American cases on the subject.  The opinions expressed in the cases cited do not furnish authority for granting the motion in the instant case, but do furnish reasons for denying same.

Thus, at page 426, the court quotes from the case of Clark v. Dew, 1 Russ. & M. 103, in which it was said:

"The practice was the same, I apprehend, in equity as at law, that a party could not move till he cleared his contempt, but that the rule must be confined to proceedings in the same cause; otherwise, the consequence would be that a party  *  *  *  might be prevented from prosecuting claims, however just, against the person who had succeeded in obtaining that order."

Again the court, also at page 436, quoted from Daniell's Chancery Pl. & Pr. vol. 1, pp. 504, 505, as follows:

"The rule that a party in contempt cannot move till he has cleared his contempt is, in practice, confined to cases ,where such party comes forward voluntarily and asks for an indulgence, and therefore a defendant cannot object to a cause being heard because the plaintiff is in contempt."

In the case of Campbell v. Justices, supra, also cited by defendant, it appears that the plaintiff had already been adjudged to be in contempt, and that, in consequence, the court refused to grant the motion or indulgence, to wit, "to proceed to hear plaintiff's exceptions to findings," made on an accounting.

In the instant case the question might again be raised as to whether under our statutes (sections 1441–1445, Compiled Laws, and chapter 22, Laws of 1925), the powers of the court are not limited, both as to the penalties that may be imposed and the procedure to be followed, to those enumerated and provided for in said statutes. However, until the validity of said statutes shall be directly and necessarily brought before the court for judicial interpretation, as in Re Atchison (D. C.) 284 F. 604, we shall assume their validity, in tenor and effect, including the rule, "Expressio unius," etc. Murray v. U. S. (C. C. A.) 284 F. 573.

To grant the defendant's motion would be to exercise powers not contemplated by our statutes. This we do not think the present occasion demands, nor do we think that it would be right to do so. The motion is denied.

Now, as to the demurrer to the complaint: The complaint is attacked on the following grounds: (1) Want of legal capacity to sue on the part of plaintiffs, and each of them. (2) Defect of parties plaintiff (improper joinder as to Goodridge, as administrator, and as to Geo. D. Schofield). (3) Several causes, condemnation and injunction, improperly united. (4) Facts stated insufficient to constitute a cause of action (in favor of either of the plaintiffs or as to the relief demanded).

The complaint seems to have been carefully drawn and states

in effect: (1) The incorporation of plaintiff Alaska Gold Recovery Company and payment of incorporation or license tax. (2) The capacity of plaintiff B. T. Goodridge, as administrator of the William O'Brien estate. (3) The incorporation of the defendant Northern Mining & Trading Co. (4) The ownership and possession of plaintiffs in the property for whose use, in part, condemnation is sought, to wit, the Combers' Right placer mining claim, lying between claims owned by the defendant and tide lands bordering on Bering Sea. (5) That the plaintiff company is the lessee from its coplaintiffs of said Combers' Right placer claim, under a mining lease for a term of years, and has expended large sums of money in the construction of a plant and mining machinery for mining said claim and adjoining property. (6) That defendant is the owner and in possession of the premises in part sought to be condemned, to wit, No. 1 Daniel's Creek, Hunter Beach, or Sweet Marie placer claims, and other claims to the west thereof. That a plat is exhibited showing location courses and distances of all of said claims and the area (1.4 acres) sought to be condemned. That the plaintiff company intends to mine said leased claim and the area between high and low tide, adjoining, and also the area beyond, the latter lying under the waters of Bering Sea, application for which is pending. (7) That defendant's said premises are idle, and have been practically worked out, especially the area sought to be condemned, and that the latter is of no immediate or substantial potential value to defendant. (8) That plaintiffs have repeatedly attempted to secure from defendant, by purchase, lease, or license, the surface rights of the area sought to be condemned, but without avail, except it be at an extortionate price, to wit, the sale of all of defendant's said properties at an excessive valuation. That the plaintiff company, in June, 1924, placed certain material on 40 feet square of defendant's said premises, whereupon defendant instituted an action, now pending, to enjoin the plaintiff company from trespassing on defendant's premises, and in which action a restraining order was issued. (9) That plaintiff's said claim is valuable only for the placer gold therein. That on account of occasional flooding by the sea of said plaintiff's premises, and of said tide lands, it is impracticable to place thereon the expensive machinery necessary to mine said premises at a profit. That also, on account of the topography of said claims and adjoining property, as well as

the said action of the sea, there is no place for the flow, deposit, or conduct of tailings or refuse matter from the workings proposed by plaintiff, nor for a reservoir for the storage of water to be used in mining said claim, nor for the erection of an aerial tram, with attendant masts, poles, tower lines, deadmen, guy lines, and equipment, with power to operate the same, all of which are necessary to be used in said mining, "and are public uses under the laws of eminent domain in said territory, and that said area proposed to be condemned is the only available site for such use. (10) The complaint fully describes by metes and bounds the tract to be condemned, and the public uses for which condemnation is asked, and necessary to said mining by plaintiff, are specified: (1) As a dumping place for a working mine, and a place for the flow, deposit, and conduct of tailings or refuse matter; (2) as a site for a reservoir necessary for collecting and storing water for use in mining; (3) for an aerial tram and power line, with equipment, appliances, structures, cables, lead lines, towers, masts, poles, guy lines, deadmen, and all other necessary equipment to permit of operating, maintaining, and keeping the same in repair. (11) The prayer for relief is amply set forth.

Taking up the grounds of the demurrer in their order, we observe:

First. As to the want of legal capacity to sue, that this has reference to some legal or personal disability, such as infancy, idiocy, or coverture. Pence v. Aughe, 101 Ind. 317; Pratt v. Expr. Co., 13 Idaho, 373, 90 P. 341, 10 L. R. A. (N. S.) 499, 121 Am. St. Rep. 268; Littleton v. Burgess, 16 Wyo. 58, 91 P. 832, 16 L. R. A. (N. S.) 49. The argument of counsel was directed to the right to the relief demanded, the want of interest in the premises proposed to be mined, the respective titles of the plaintiffs, their power to lease the premises, the effect of such leases, and generally treating the premises proposed to be mined as "dominant estates," in which plaintiffs had no sufficient interest on which to predicate the right of eminent domain. These questions do not touch the want of legal capacity to sue. Howell v. Iola P. C. Co., 86 Kan. 450, 121 P. 346; Valley Lumber Mfg. Co. v. Driessel, 13 Idaho, 662, 93 P. 765, 15 L. R. A. (N. S.) 299, 13 Ann. Cas. 63. The right of eminent domain is wholly independent of the question of tenancy. W. U. Tel. Co. v. Penn. R. Co. (C. C.) 120 F. 369. So, also, an

administrator, who has qualified, has "legal capacity to sue." Homans v. N. Y. Life Ins. Co., 55 Misc. Rep. 574, 106 N. Y. S. 929; Ward v. Petrie, 157 N. Y. 301, 51 N. E. 1002, 68 Am. St. Rep. 790. And he need not join the heirs. Section 849, Compiled Laws Alaska 1913.

Second. As to the question of defect of parties, this objection reaches only a defect of necessary parties, and not the absence of proper parties. Beach v. Spokane Ranch & Water Co., 25 Mont. 379, 65 P. 111. It does not include a joinder of improper parties, Great Western Compound Co. v. Ætna Ins. Co., 40 Wis. 373; Palmer v. Davis, 28 N. Y. 242; or an excess of parties, or that too many parties are brought in, New York & New Haven R. Co. v. Schuyler, 17 N. Y. 592; Words and Phrases, First and Second Series; Mader v. Plano Mfg. Co., 17 S. D. 553, 97 N. W. 843; Tieman v. Sachs, 52 Or. 560, 98 P. 163; United States v. Comet Oil & Gas Co. (C. C.) 187 F. 674. In our view of the case the only necessary party was the Alaska Gold Recovery Company, to wit, "the person in charge of the public use for which the property is sought, who must be styled plaintiff." A defect of parties does not appear on the face of the complaint, nor can the objection of a misjoinder or excess of parties, under our practice, be reached by a general demurrer. It seems that in some jurisdictions, such as Indiana, California, and Nevada, the practice is otherwise. In this jurisdiction the grounds of demurrer must be distinctly and specifically stated. Section 891, Comp. Stat.

Third. As to several causes of action being improperly united, this objection is undoubtedly based upon the fact that the prayer of the complaint included with the prayer for condemnation also a prayer for injunctive relief. The pleader probably regarded the proceedings as equitable in their nature, when in fact they are proceedings at law. But a "cause of action" refers entirely to the facts stated, and not to the relief demanded. There was but one cause of action stated in the complaint, to wit, the right to condemn. The prayer for improper or inconsistent relief does not render a complaint demurrable. Colstrum v. Minneapolis, etc., R. Co., 31 Minn. 367, 18 N. W. 94.

Fourth. Several reasons were urged by the defendant to show that the complaint did not state facts sufficient to constitute a cause of action:

(1) It was claimed that there was a misjoinder of parties, and that this could be taken advantage of under this general ground of the demurrer. Defendant sought to show that the interests of the parties in the subject-matter of the action, and in the relief demanded, were not common, and that as to some of the plaintiffs no interest at all was shown; that plaintiff Schofield, as lessor, had parted with his interest; that plaintiff administrator of the O'Brien estate had no interest in the real estate, and could not lease such interest; that a lease to mine was, in effect, a sale; that the tide lands and the lands under the waters of Bering Sea were part of the public domain; and that the Combers'· Right placer claim was not a "mine," within the category of the eminent domain statutes. A sufficient answer to these objections has already been given in considering the second ground of the demurrer. A misjoinder of parties is not, under our statutes, made a ground for demurrer, whatever other form of attack it may invite. Paulson v. City of Portland, 16 Or. 450, 19 P. 450, 1 L. R. A. 673. Section 870, Compiled Laws of Alaska, provides that:

"All persons having an interest in the subject of the action, and in obtaining the relief demanded, may be joined as plaintiffs."

The defendant is not concerned or interested in the degree or quantity of estate or interest held by plaintiffs, if they have an interest. Section 1067, Compiled Laws, provides that:

The court may give "judgment * * * for or against one or more of several plaintiffs and * * * determine the ultimate rights of the parties on each side as between themselves."

The quantity or quality of interest on part of plaintiffs in the subject-matter of an action, or in the relief demanded, to constitute them proper parties in proceedings to condemn land under the eminent domain statutes, is not specified by the statutes. Under section 633, Compiled Laws, "the right of eminent domain may be exercised in behalf of the * * * public uses" mentioned. Section 636 provides that "the plaintiff or defendant or any party interested in the proceedings can appeal. * * *" Thus it would appear that the subject-matter of the proceedings is one of public, rather than of private, interest. Section 639, Id., provides who shall be "styled plaintiff," to wit, the "person in charge of the public use for

which the property is sought." He or it is the "necessary party." Others may be "proper parties."

(2) We hold that the word "mines," as used in the statute—e. g., "supplying mines * * * with water," and "roads, tunnels, ditches, flumes, pipes, and dumping places for working mines"—is sufficiently broad to include, and was intended to include, placer mining ground, and that both lode and placer claims are so included, irrespective of whether they are already opened up or not.

(3) Some criticism was offered because the complaint sought to condemn "a fee" where only an easement was contemplated in the statute, and "an easement" where the statute only contemplated a fee. Section 634, Compiled Laws, merely classifies the estates and rights "subject to be taken," not that must be taken. It is sufficient to say that the court, on a final hearing, will grant only such relief as plaintiffs shall show themselves entitled to, which relief will be within the limits set by the prayer of the complaint and the statutes. It is not now necessary to determine the quantity or character of the estate to be granted, if any, remembering always that "the greater includes the less."

(4) As to the right of plaintiffs to mine the premises between high and low tide, and the land under the waters of Bering Sea, belonging to the government, this was expressly granted by section 129, Compiled Laws of Alaska, which reads, in part, as follows:

"The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to the district of Alaska: Provided, that subject only to such general limitations as may be necessary to exempt navigation from artificial obstructions *all land and shoal water between low and mean high tide on the shores, bays, and inlets of Bering Sea,* within the jurisdiction of the United States, shall be subject to exploration and mining for gold and other precious metals by citizens of the United States, or persons who have legally declared their intentions to become such, under such reasonable rules and regulations as the miners in organized mining districts may have heretofore made or may hereafter make governing the temporary possession thereof for exploration and mining purposes until otherwise provided by law: Provided further, * * * no exclusive permit shall be granted by the Secretary of War authorizing any person or persons, corporation or company to excavate or mine under any of said waters *below low tide,* * * * but citizens of the United States or persons who have legally declared their intention to become such shall have the right to dredge and mine

for gold or other precious metals in said waters, below low tide, subject to such general rules and regulations as the Secretary of War may prescribe for the preservation of order and the protection of the interests of commerce.  *  *  *"

As to the existence or nonexistence of any rules or regulations, or as to their observance, we are not now concerned, nor is the defendant. They are not conditions precedent, needing recital in the complaint. But the plaintiff's right does not depend upon a dominant estate. It depends upon the right conferred by statutes. W. U. Tel. Co. v. Penn. R. Co. (C. C.) 120 F. 369, supra.

(5) Aside from the many technical questions raised by the defendant in support of its demurrer, the defendant broadly challenges the right of the plaintiffs to condemn the land in question; its contention being that it is not made to appear by the complaint that the use to which it is sought to devote the property is in fact a public use. This question it must be admitted is the crux of the case. We are at the outset confronted with divergent opinions on part of the state and federal courts as to what is, and what is not, a public use. One line of decisions draws a sharp distinction between public use and public benefit, and guards the private rights of property against the assertion of the power of eminent domain for public benefit or public advantage—public welfare—as distinguished from use by the public. The other line of decisions favors the public welfare—public benefit theory—that the public interests should prevail over private property rights, even though the use for which the power of eminent domain is asserted is not in a strict sense a public use, and that it is enough if the taking tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable part of the inhabitants of a section of the state or territory. The courts leaning to the latter view hold that the term "public use" is, in the Constitution, flexible, and has been of constant growth, as new public uses have developed. Lindley, in his work on Mines, at section 264, says:

"It is manifest that there is a marked tendency, evolutionary in its nature, to break away from the old rigid rules on the subject of public use, and to enlarge the definition of the term, so as to make it synonymous with 'public welfare,' * * * with the promise of its becoming the prevailing doctrine in most jurisdictions."

Indeed, we find it the "prevailing doctrine" in the Western and gold-producing states and in the federal courts.

Snyder, in his work on Mines, at section 1071, says:

"Primarily it is a political question. * * * It matters not whether the people express their will through the Constitution or through the Legislature, within the bounds of the Constitution."

And we find that both the Congress of the United States and its agent, the territorial Legislature, have expressed the "will" of the people in providing for the uses here sought under the power of eminent domain.

Those statutes confer the power that the plaintiffs seek to exercise, and their constitutionality is drawn in question. The point is made that the use sought to be exercised is a private and not a public use. It is the consensus of judicial opinion everywhere that the question whether the use is in fact public or not, so as to justify the taking without the consent of the owner, is, ultimately, one which the courts alone may determine. "On the other hand," as said by Judge Wolverton, in Shasta Power Co. v. Walker (C. C.) 149 F. 568:

"It is just as well settled that the necessity or expediency for the taking, the instrumentalities by which it may be done, and the mode of procedure to be observed are matters resting wholly within the province and discretion of the legislative department"—citing many cases.

And Judge Wolverton continues:

"It is the general doctrine that, if it be doubtful whether legislation is within or inimical to the Constitution, the courts should resolve the doubt by sustaining the law-making body"—citing cases.

The demurrer in that case was overruled for reasons stated, but the court added:

"If * * * it can be shown by extrinsic evidence, under issues properly formulated, that the end sought to be accomplished is not of a public character, but is solely for private purposes, the condemnation should be denied as being in excess of legislative power."

We infer that it is a safer rule to try the issues, so framed, than to foreclose the plaintiff by sustaining the demurrer. We are inclined, also, to follow the more liberal rule of construction furthering the interests and protection of the public, on the one hand, and depriving the defendant, on the other hand,

of the right to obstruct the public necessity and convenience by obstinately refusing to part with his property when needed for public use—i. e., public welfare, benefit, and advantage.   We take into account the alleged fact that plaintiffs propose to mine, under the statute quoted in this opinion, the tide lands and the land under the waters of Bering Sea, known to contain deposits of gold, and being peculiarly government property, a part of the public domain, not for sale, but held in trust by the government for the general use of the public.   Such lands, under the common law, were crown lands.   Under our system they are taken over by the government.   Surely no one would deny the right of the government to mine these lands under such agencies and instrumentalities as it might see fit to use, including the right of eminent domain.   When the government has delegated this right to others, the public, without exclusive privileges, we see no reason to hold that the privilege, when accepted, becomes private, or to hold that the means of enjoying such privilege are no longer a public use.   In this view, the case at bar differs from other cases to be found in the books.   The case is exceptional, as were the cases of Strickley v. Highland Boy Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, and Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, in which well-nigh private uses were held to be public uses—one of these a gold mining case; the other, an irrigation case.   Nor do we think the rule would have been different, had the question been raised under the Fifth Amendment, than when raised under the Fourteenth Amendment, as it necessarily was raised in the cases last above.   The "benefit" or "advantage" rule was applied in said cases.

We find further support for our views in a number of other cases, including opinions from the United States Circuit Court of Appeals for the Ninth Circuit.   Thus in the case of Burley v. United States, 179 F. 9, 33 L. R. A. (N. S.) 807, the court says:

"In this case the United States is the owner of large tracts of land within the state. * * * The public welfare requires that these lands as well as those held in private ownership, should be reclaimed and made productive.   To do this effectively and economically (enumerating certain things declared necessary].   To do this," the court said, there is "no constitutional objection, * * * when it is clearly established that with respect to surrounding circumstances and conditions the use is a public use."

Citing Fallbrook Irr. District v. Bradley, 164 U. S. 112, 161, 17 S. Ct. 56, 64 (41 L. Ed. 369), and quoting from the opinion in that case, it continued:

"Millions of acres" would "otherwise * * * be left in their present arid and worthless condition, and an effectual obstacle * * * remain in the way of the advance of a large portion of the state in material wealth and prosperity."

As was said in Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956:

"The national government is the most considerable owner, and has power to dispose of and make all needful rules and regulations respecting its property."

This is especially true in the territories, where Congress may exercise the same powers as the Legislature may exercise in a state. First Nat. Bank v. County of Yankton, 101 U. S. 129, 25 L. Ed. 1046.

As early as July 26, 1866, by sections 2338 and 2339, R. S. (30 USCA §§ 43, 51), carried forward in the Compiled Laws of Alaska as sections 150 and 151, private uses pertaining to the mining industry were recognized. Compare section 2340, R. S. (30 USCA § 52), section 152, Comp. Stat. (See note.) We are not certain that these statutes and uses do not still obtain, whether expressed, as conditions, in defendant's patent or not. They included "rules for working mines, drainage, and other necessary means for their complete development"— i. e., of the mines. We mention the above statutes to show the early policy of the government regarding mining. The above statutes were followed by the eminent domain statutes under which these proceedings were brought. See note 2 appended hereto. It is the constitutionality of these statutes that have been brought in question in this case.

A number of eminent domain cases originating in Alaska have been considered in the United States Circuit Court of Appeals for the Ninth Circuit, and we are not aware that the constitutionality of these statutes has been questioned. The above court, in the interpretation of the statutes and the term "public use" in the Fifth Amendment to the Constitution, seems to follow the more liberal construction, and favors the "public welfare" theory. In the case of Van Dyke v. Midnight Sun M. & D. Co. (C. C. A.) 177 F. 85, the court says:

"Apart from the fact that the court will take judicial notice of the climatic and physical conditions of the Seward Peninsula, * * * the evidence presented to the court below shows without conflict that that peninsula is valuable chiefly, if not entirely, for its gold and other mineral deposits. * * * To states and territories so circumstanced, it has long been settled that the common-law doctrine of riparian rights is inapplicable."

So we take judicial notice and observe the mutations of the law based upon necessities and public welfare. The Supreme Court in Boquillas Cattle Co. v. Curtis, 213 U. S. 339, 29 S. Ct. 493, 53 L. Ed. 822, found occasion to say:

"We agree with the territorial court that * * * patentees of a ranch on the San Pedro are" far from having "the same rights as owners of an estate on the Thames."

So again, in regard to mining claims bordering on the shores of Bering Sea in Seward Peninsula, the owner may have other rights than an owner of a "ranch on the San Pedro."

In Miocene Ditch Co. v. Jacobsen (C. C. A.) 146 F. 680, which, however, was an injunction case, the plaintiffs' rights under these statutes were considered, and the decisions in Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, and Strickley v. Highland Gold Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, were cited and approvingly referred to, and the court say:

"In Clark v. Nash * * * the court had occasion to discuss the question of the right of eminent domain under the provisions of the Utah statute, which in all essential respects is similar in its provisions to the Code of Alaska."

The cases cited approve the "public benefit" theory—the Utah statute, and hence the Alaska statutes.

In the case of Miocene Ditch Co. v. Lyng (C. C. A.) 138 F. 544, an eminent domain case, the judgment dismissing the action was affirmed on the ground of the insufficiency of the complaint, which did not allege a public use, but with leave to amend, showing that the statutes at least were regarded valid.

In the case of Empire Water & Power Co. v. Cascade Town Co. (C. C. A.) 205 F. 128, it was said:

"In framing Constitutions, wisdom frequently requires the use of general terms, which should be held as progressively adaptable to natural development, and as open to embrace new instances as they arise and come clearly within the spirit of the provisions," and "even the incidents of ownership may be cut down by the peculiar laws and

usages of a state." Otis Co. v. Ludlow Co., 201 U. S. 154, 26 S. Ct. 353, 50 L. Ed. 696, citing Eldredge v. Trezevant, 160 U. S. 452, 466, 16 S. Ct. 345, 40 L. Ed. 490.

Thus we find that the term "public use" has received enlarged scope and meaning; that the test is no longer confined to use by the public, but use for the public welfare. The power of a state to work out from the conditions existing in a mining region the largest welfare of its inhabitants has often been recognized. Bacon v. Walker, 204 U. S. 316, 27 S. Ct. 289, 51 L. Ed. 499. The opinion of the Legislature and of the Supreme Court of Utah that "the public welfare of that state demands that aerial lines between the mines   *   *   *   should not be made impossible by the refusal of a private owner to sell the right to cross his land," was recognized by the Supreme Court of the United States in Strickley v. Highland Boy Mining Co., 200 U. S. and at page 531, 26 S. Ct. 303, 50 L. Ed. 581, the court say, referring to the opinion in Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085:

"In discussing what constitutes a public use, it recognized the inadequacy of use by the general public as a universal test."

Mr. George Sutherland, of counsel in that case, now Justice Sutherland, said in his brief:

"Irrigation was held to be a public use in Clark v. Nash; no less important to the public policy and general welfare of the state is the development of its mineral resources"—citing Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369.

In Block v. Hirsh, 256 U. S. 155, 41 S. Ct. 459, 65 L. Ed. 865, 16 A. L. R. 165, it was held that:

"The use by the public generally of each specific thing affected cannot be made the test of public interest."

This was a District of Columbia case, not depending on any theory of state rights. In the case last above the court further says:

"The notion that" property rights are absolute and "exempt from *   *   *   legislative modification required from time to time in civilized life is contradicted, not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay."

7 A.R.—26

Turning to the subject "Eminent Domain," we read (10 R. C. L. 28, § 26):

"The Supreme Court has found nothing in the Federal Constitution which prevents the condemnation by one person for his individual use of a right of way over the land of another for an aerial bucket line, Strickley v. Highland Boy G. M. Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581; of a right of way for the construction of an irrigation ditch, Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; or the right to construct a spur railroad track to a private establishment over the land of another, Hairston v. Danville, etc., R. R. Co., 208 U. S. 598, 28 S. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008."

And see Byrnes et al. v. Douglass et al. (C. C. A.) 83 F. 45, where right of way for tunnel to reach mine was condemned.

The article on eminent domain in R. C. L., in stating "the true meaning of public use," does not, however, wholly accept the "public advantage or general welfare" theory. But at section 46 it is said:

"Every honest employment is beneficial to the public and deserves encouragement, but it is not the function of the state to make discriminations in favor of one employment against another. This is the theory of the law; but when the natural conditions in a state are such that, unless the owners of wild and uncultivated lands can be compelled to yield their undoubted property rights in such a way as to enable their neighbors to make use of the natural resources of their own lands, the development of the state will come to a stop, and its inhabitants will be obliged to abandon their homes or starve, the doctrine, 'Salus populi suprema lex,' comes into play. * * * It may be accepted as settled law that, when a particular industry is vital to the prosperity of an entire region, and that industry cannot be carried on without some invasion of the rights of private property, * * * such invasion may constitutionally be authorized."

Again, quoting from 10 R. C. L. 8, § 4:

"There is another branch of the police power which more nearly resembles eminent domain. When property or rights in which several persons have a common interest cannot be fully and beneficially enjoyed in its existing condition, and the parties interested therein cannot agree on a scheme for its advantageous use, the law often provides a way in which they may compel one another to submit to measures necessary to that end, making just compensation to any of the proprietors whose control of the property or interest therein has been modified by the new arrangement, which compensation those of the proprietors who are benefited are obliged to pay. The exercise of this power is in most instances on property or rights held in common, but the principle is the same if applied to a tract of land affected by common necessities and interests, although divided into parcels held

by individual owners in severalty"—citing Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39.

In the case of Highland Boy Gold Min. Co. v. Strickley, 28 Utah, 215, 78 P. 296, 1 L. R. A. (N. S.) 976, 107 Am. St. Rep. 711, 3 Ann. Cas. 1110, affirmed by the Supreme Court 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, it was said:

"The construction of roads and tramways for the development of the mining industry is a public use," on "the same line of reasoning" as held in Clark v. Nash in regard to irrigation ditches. "Otherwise" adjoining owners "would be clothed with power to demand and compel payment of an unconscionable price for their lands before parting with the title, or they could refuse, absolutely, to grant the easement required on any terms, and thereby in some cases cripple mining enterprises, or destroy them altogether. Such a policy would not only be inconsistent and unreasonable, but would greatly retard the development of one of the greatest natural resources of the state. We are therefore of the opinion, and so hold, that the construction and operation of roads and tramways for the development and working of mines is a public use. The act of the Legislature under consideration makes ample provision for the payment of a fair price to the owner for lands sought to be condemned, and for all damages that he may suffer because of such taking, and is therefore valid."

In Noble State Bank v. Haskell, 219 U. S. 110, 31 S. Ct. 187, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, it was said:

"An ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use."

Again:

"We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a nolumus mutare as against the law-making power."

Besides the cases already referred to, we find in the brief of plaintiffs additional cases which are pertinent to the questions already discussed. We shall content ourselves by a mere citation of them: Potlatch Lumber Co. v. Peterson, 12 Idaho, 769, 88 P. 426, 118 Am. St. Rep. 233; Kipp v. Davis-Daly Copper Co., 41 Mont. 509, 110 P. 237, 36 L. R. A. (N. S.) 666, 21 Ann. Cas. 1372; Oury v. Goodwin, 3 Ariz. 255, 26 P. 376; Dayton Mining Co. v. Seawell, 11 Nev. 394; Tanner v. Treasury T. M.

& R. Co., 35 Colo. 593, 83 P. 464, 4 L. R. A. (N. S.) 106; Overman S. M. Co. v. Corcoran, 15 Nev. 147; Ellinghouse v. Taylor, 19 Mont. 462, 48 P. 757.

The mining of gold has been held to be a public use on account of its relation to the public currency. 10 R. C. L. p. 56, and note 15 L. R. A. (N. S.) 617.

If doubt should still exist as to the "flexibility" of the Constitution, we are reminded of the language of that eminent jurist, John F. Dillon, who said in his Introduction to the Life, Character and Judicial Services of John Marshall:

"The flexibility of the Constitution, arising out of the general language in which its powers and prohibitions are expressed, was the means of perfecting and probably of saving it."

Aside from other considerations involved in this case, we have to consider the mutations of the common law regarding what was once known as the jus privatum and the jus publicum, and fully explained in the case of Trustees of the Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, 11 Ann. Cas. 1. We gather from this case, briefly, that in this country the common law of England relating to littoral and riparian rights does not obtain, and is not adaptable in every particular to our political and geographical conditions. Thus, the jus privatum of the crown, by which the sovereign of England was deemed to be the "absolute owner of the soil of the sea and of the navigable rivers," was totally inapplicable to our conditions, and this right seems to have passed or been abandoned to the "proprietors of the upland, so as to have become a common right," and thus the common law of the state. With its modifications the common law has been extended to Alaska. Except in so far as the jus privatum of the crown has devolved upon littoral and riparian owners, that right now resides in the people in their sovereign capacity, and so far as Alaska is concerned is necessarily under the regulations of Congress.

As to the rights of the public to use the foreshore upon the margin of our tide waters for fishing, bathing, and boating, and the right of passage as a necessary incident, they devolved under the common law. As to the right to mine such public land, it devolved by the act of Congress above quoted, and with the latter right, and as an incident thereto, the exercise of the right of eminent domain separately and distinctly delegated by

Congress in general terms under the chapter on Eminent Domain, the necessities for which Congress has determined. As to the right to the gold in the foreshore or lands under the sea, if it existed at common law in the upland owner, that right was modified to the extent of making the right a common or a public right, and then, of course, as such subject to the police powers and regulations of Congress. The mining of such land is therefore necessarily of a public character, nature, or use. It follows, also, that the instrumentalities necessarily used in conducting such mining are also a public use. They have become "elevated" to a public use. Without their use the grant or license would not avail. In the case of Barnes v. Midland Ry. Co., 193 N. Y. 378, 85 N. E. 1093, 127 Am. St. Rep. 962, it was held that a littoral owner had the right to construct and maintain a pier that was reasonably adapted to the purpose for which it was intended, to wit, to provide a means of passage from the upland to the sea, and that this right was paramount to the said public right "to pass along the foreshore," so long as the littoral right did not pass the bounds of "necessity and reason." When they do, the rights are reversed, and the rights of the public become paramount. The right of the littoral owner in such case is based upon the right necessary to enable him to make a reasonable use of the upland (private use); but where, as here, he is permitted to make a reasonable use of the public land, it is no longer a private use, but one in which the public is interested. It will be seen from the plat, exhibited with the complaint, that as against the plaintiffs the defendant is not an "upland owner," but that plaintiffs are, at the point in question.

It will readily be seen that the facts in the instant case are of the peculiar kind referred to in the Clark and Strickley Cases.

In addition to cases already referred to, we call attention to the case of Goldfield Consol. M. & T. Co. v. Old Sandstorm A. G. M. Co., 38 Nev. 426, 150 P. 313. The opinion by Coleman, Judge, covers nearly every point raised in the case at bar, and contains an exhaustive review of the authorities. The condemnation sought was a dumping ground for the deposit and storage of tailings. Plaintiff prevailed.

In Brown v. United States, 263 U. S. 78, 44 S. Ct. 92, 68 L. Ed. 171, it was held that taking property to rebuild in part a town elsewhere as a substitute for part of town taken for irrigation reservoir was a taking for public use—it being a reason-

able means to further the irrigation project. The buildings were, of course, for private use; nevertheless the "taking" was for a public use.

In Old Dominion Land Co. v. U. S. (C. C. A.) 296 F. 20, the condemnation of land on which warehouses had been built (on leased land), in order to salvage the warehouses, was the taking for a public use. "To hold such a condemnation not to be for a public use would be to give away immense public treasure by a narrow and technical limitation of the meaning of 'public use.' * * * This conclusion is in accord with the principle applied in Strickley v. Highland Boy G. M. Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174; Hairston v. Danville & Western Ry. Co., 208 U. S. 598, 28 S. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008; Brown v. U. S. [263 U. S. 78], 44 S. Ct. 92, 68 L. Ed. 171." See Alabama Power Co. v. Gulf Power Co. (D. C.) 283 F. 606; yet it cannot be contended that the warehouses were to be used except for sale and to be held in private ownership.

The foregoing observations have been made to show some of the difficulties in arriving definitely at the law of the case, and in the propriety of following the practice adopted by Judge Wolverton in overruling the demurrer in the case of Shasta Power Co. v. Walker (C. C.) 149 F. 568, referred to in an earlier part of this opinion.

Other questions, more or less fundamental and germane, suggest themselves. The power of eminent domain is inherent in the government. It does not depend upon the Constitution. Without the limitation in the Constitution, private property could be taken for private as well as public use. Until the adoption of the Fourteenth Amendment, such power was reserved in the states. The limitation of the Fifth Amendment only reached the federal government. The question naturally arises: Was not this a limitation only upon the federal powers, and not upon the plenary powers conferred upon Congress in legislating for the territories? The distinction has been often made. The states, as such, were not interested in the territories, or in withholding from Congress, in the territories, powers which they reserved in themselves, or in state Legislatures. Is not the limitation in the Fifth Amendment inconsistent with powers granted Congress to regulate property in the territories? Article 4, § 3, cl. 2. The Constitution was not extended, proprio vigore,

to the territory.   Alaska was acquired by purchase in 1867. The Fourteenth Amendment was ratified in 1868.   Where was the power lodged, as to territories, which the states reserved for themselves within the states?   Did not Congress have power to impose conditions upon sales made of any part of the public domain in the territory of Alaska?   Were not all patents of mining claims subject to the eminent domain statutes?   And this without reservations such as were mentioned in sections 2338, 2339, and 2340, R. S.?   See People ex rel. Aspen M. & S. Co. v. District Court, Pitkin County, 11 Colo. 147, 17 P. 298.

If the Constitution was extended by Congress to Alaska, so far as applicable, did such extension deprive Congress of any power that it had over the territory prior to such extension? Whatever power it had was granted by the same Constitution or inherent.   It would seem strange that the extension of the Constitution should have such effect, and equally strange that, if such were to be the effect, Congress would extend the Constitution without reserving a power theretofore possessed in the territory, especially if equal to the power reserved by the people in the states.   Could Congress divest government of an inherent power, except by admitting the territory to statehood? Or have we not understood the declaration of the Supreme Court in Bank v. Yankton County, supra, to the effect that Congress can do for the territories what the Legislature can do for the state?   Before the Fourteenth Amendment there was no national citizenship, except through state citizenship.   State citizenship never did politically operate in Alaska.   Who was there to question the territorial power of Congress when legislating for Alaska?   These questions multiply the difficulties in passing upon the constitutionality of the eminent domain statutes of Congress.   The uses contemplated by these statutes are those prayed for by plaintiff.

The demurrer is overruled; it being understood that, in the absence from this jurisdiction of the attorneys for both parties, the defendant will be given a reasonable time in which to plead.

·Note 1.

Compiled Statutes U. S. 1913, § 4646 (R. S. § 2338):

"As a condition of sale, in the absence of necessary legislation by Congress, the local Legislature of any state or territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development; and those conditions

shall be fully expressed in the patent." Act July 26, 1866, c. 262, § 5, 14 Stat. 252.

Section 4647 (R. S. § 2339):

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." Act July 26, 1866, c. 262, § 9, 14 Stat. 253.

Section 4648 (R. S. § 2340):

"All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the preceding section." Act July 9, 1870, c. 235, § 17, 16 Stat. 218.

## Note 2.

Chapter 22, Compiled Laws of Alaska 1913 (Act June 6, 1900):

"Sec. 633. Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses:

"(1) All public uses authorized by the government of the United States.

"(2) Public buildings and grounds for the use of the district, and all other public uses authorized by Congress or other legislative authority of the district. * * *

"(4) Wharves, docks, piers, chutes, booms, ferries, bridges of all kinds, private roads, plank and turnpike roads, railroads, canals, ditches, flumes, *aqueducts, and pipes* for public transportation, *supplying mines* and farming neighborhoods *with water*, and draining and reclaiming lands, and for floating logs and lumber on streams not navigable, and sites for reservoirs necessary for collecting and storing water.

"(5) Roads, tunnels, ditches, *flumes, pipes*, and dumping places for *working mines;* also *outlets*, natural or otherwise, for the flow, *deposit*, or conduct of *tailings* or *refuse matter from mines;* also *an occupancy in common* by the owners or possessors of different mines of any place for the flow, deposit, or conduct of tailings or refuse matter from their several mines, and sites for reservoirs necessary for collecting and storing water.

"(6) Private roads leading from highways to residences, mines, or farms. * * *

"(10) *Tramway lines.*

"Sec. 634. That the following is a classification of the estates and rights in lands subject to be taken for public use:

"(1) A fee simple, when taken for public buildings or grounds, or for permanent buildings, for reservoirs and dams, and permanent flooding occasioned thereby, or for an outlet for a flow, or a place for the deposit of débris or tailings of a mine.

"(2) An *easement* when taken for any other use.

"(3) The right of entry upon and occupation of lands, and the right to take therefrom such earth, gravel, stones, trees, and timber as may be necessary for some public use.

"Sec. 635. The private property which may be taken under this chapter includes:

"(1) All real property belonging to any person. * * *

"(3) Property appropriated to public use; but such property must not be taken unless for a more necessary purpose than that to which it has already been appropriated. * * *

"(5) All rights of way for any and all the purposes mentioned in section six hundred and thirty-three, and any and all structures and improvements thereon, and the lands held and used in connection therewith must be subject to be connected with, crossed, or intersected by any other right of way or improvements or structures thereon. They must also be subject to a limited use, in common with the owner thereof, when necessary; but such uses, crossings, intersections, and connections must be made in manner most compatible with the greatest public benefit and least private injury."

"Sec. 636. Before property can be taken it must appear:

"(1) That the use to which it is to be applied is a use authorized by law.

"(2) That the taking is necessary to such use.

"(3) If already appropriated to some public use that the public use to which it is to be applied is a more necessary public use.

"The plaintiff or defendant or any party interested in the proceedings can appeal to the United States Circuit Court of Appeals for the Ninth Circuit from any finding or judgment made or rendered under this chapter, as in other cases. Such appeal does not stay any further proceedings under this chapter."

"Sec. 639. The complaint must contain:

"(1) The name of the corporation, association, commission, or person in charge of the public use for which the property is sought, who must be styled plaintiff.

"(2) The names of all owners and claimants of the property, if known, or a statement that they are unknown, who must be styled defendants.

"(3) A statement of the right of the plaintiff.

"(4) If a right of way be sought, the complaint must show the location, general route, and termini, and must be accompanied with a map thereof, so far as the same is involved in the action or proceeding.

"(5) A description of each piece of land sought to be taken, and whether the same includes the whole or only a part of the entire parcel or tract. * * *"

Note 3.

Chapter 55, Session Laws 1913 (S. B. No. 61):

"An act declaring the use of water for mining, power and other purposes, and the use of pole and tower lines for telephone and telegraph purposes for *aerial tram* and for the transmission of electric light and power to be a public use and providing for the condemnation of rights of way therefor.

"Be it enacted by the Legislature of the territory of Alaska:

"Section 1. The use of water for mining, power and municipal purposes and the use of pole and tower lines for telephone and telegraph wires, for aerial trams and for the transmission of electric light and electric power, by whomever utilized, are each and all declared to be beneficial to the public and to be a public use within the provisions of chapter twenty-two of part V of the Alaska Code. Rights of way across private property, whenever the same shall be shown to be necessary for operation of the mine or other project in connection with which it is intended to be used may be condemned and taken therefor in the manner as laid down in chapter twenty-two, part V, of the Alaska Code, and all proceedings to enforce the rights herein granted must be in accordance with those laid down in said chapter.

"Sec. 2. The right of way for which provision is made in the last preceding section shall extend only to a right of way along, upon and across the surface of the lands to be condemned and to a strip thereof of sufficient width to permit of the construction thereon of such ditch, flume pipe line, canal or other means of conveying water as shall be adequate for the purposes intended, or for the setting of poles or the construction of *towers* upon which to string wires for telephone and telegraph lines and lines for the transmission of electric light or power for the operation of *aerial trams* and to permit of maintaining the same and keeping it in repair.

"Sec. 3. The word 'person,' whenever used in this act, shall be deemed to mean either a natural person, partnership, association, corporation or any other group or combination of natural persons.

"Sec. 4. So much of chapter twenty-two of part V of the Alaska Code and all other acts or parts of acts inconsistent or in conflict with the provisions hereof are hereby repealed.

"Sec. 5. This act shall take effect and be in full force as provided by law.

"Approved April 28, 1913."